[No. A068390. First Dist., Div. Three. Apr. 25, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
NELSON BEVELY MOORE, Defendant and Appellant.

## COUNSEL

Kenneth L. Jesmore, under appontment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman, Susan E. Myster and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORRIGAN, Acting P. J.**—This appeal involves a question of first impression: can a person cohabit with two different people at two different locations during the same period of time? The issue arises in a prosecution under Penal Code section 273.5,[1] inflicting corporal injury on a cohabitant. We conclude that, for purposes of criminal liability under section 273.5, a person may cohabit simultaneously with two or more people at the same time. Thus, we affirm the judgment.[2]

### Factual and Procedural Background

On July 20, 1994, the Marin County District Attorney filed a 16-count information charging defendant Nelson Bevely Moore with a number of crimes committed against Karyn Barker over a 15-month period. Among other things, the information charged defendant with six counts of inflicting corporal injury on a cohabitant on six dates between March 27, 1993, and February 20, 1994. Three of these counts, occurring between August 7, 1993, and February 20, 1994, are at issue here. Defendant contends he did not "cohabit" with Barker during this period.

Karyn Barker and defendant met in July 1991. In September 1991, they began living together in Menlo Park. Around September 1992, they moved to Novato and cosigned an apartment lease. At trial, Barker testified that she and defendant lived there together until February 26, 1994, except for one occasion when defendant moved out for a week.[3] When defendant left for that week, he took only a small sports bag and some clothes, leaving all his other personal possessions at the apartment.

Barker recounted a number of incidents in which defendant struck, kicked, or otherwise physically abused her. In one contested incident in August 1993,[4] defendant bit her over the right eye, resulting in two puncture wounds, bleeding, and swelling. Later that evening, defendant threatened to stab Barker with a kitchen knife, saying he had no reason not to kill her and

---

[1]All further statutory references are to the Penal Code.

[2]This appeal was originally filed pursuant to *People* v. *Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071]. We requested briefing on the substantive issue of simultaneous cohabitation, which the jurors originally raised in a written question to the trial court.

[3]Barker testified the one-week period occurred in December, but she could not remember whether the year was 1992 or 1993.

[4]The exact date of this incident is unclear from the record. Originally, Barker testified the date was August 17, 1993. Later, she placed it on August 7, 1993. Novato Police Officer Lewis Spengler testified that he responded to Barker's telephone call for assistance sometime between 8 p.m. on August 8 and 6 a.m. on August 9, 1993. The information charged that the incident occurred on or about August 7, 1993.

that he wanted to kill one woman before he died. After defendant left the house, Barker called the police. As she was talking to the dispatcher, defendant returned and pounded on the door. Barker would not admit him. Officer Spengler responded to Barker's call for help. Based on the description of defendant and the vehicle he was driving, Spengler made contact with defendant at a nearby convenience store. Defendant was "very agitated." He told Spengler he was not going to be locked out of "his" apartment, saying: " 'The bitch can't lock me out. I pay the rent.' . . . 'I told the bitch the last time she locked me out, if she did it again I'd kill her.' " Spengler also testified that Barker "said words also to the effect that she didn't have any right to lock him out because it was his place, his apartment."

On November 18, 1993, defendant punched Barker in the face and head. Barker testified that she and defendant were still living together at the time and nothing had changed in their living arrangement since the previous incident in August.

Around February 20, 1994, defendant again attacked Barker, wrenching her arm while hitting her with his fist. Following this incident, Barker left the apartment and received hospital treatment. After spending several days in a hotel, Barker returned to the apartment on February 26. She intended to change the locks, get a restraining order, and force defendant to leave. When she arrived, however, she found that defendant had changed the locks himself. She summoned a locksmith, but before one arrived, defendant returned with a friend. Barker became frightened and left.

Barker telephoned the police seeking help with reentry to the apartment. Again, Officer Spengler responded. After discussing the situation with Spengler, Barker decided to report the assault and seek official intervention. Barker waited until defendant left the apartment and then changed the locks. The next day, Barker obtained a restraining order.

On March 24, 1994, Barker saw defendant at a previously scheduled therapy session. During the session, Barker told defendant he would have to move from the apartment. He became very angry and said: " '. . . I'm going to blow your car up. I'm going to blow you up. If I don't do it myself, I know someone who will do it for me.' " At that point, the therapist ended the session. On April 10, the date set for defendant to move out of the apartment, Barker put all his possessions on the front porch and left.

The prosecution introduced receipts, bills, and other documents showing that, during the time he claimed he was not living with Barker, defendant gave the Novato apartment address as his residence for his pager, job resumés, automobile insurance, delivery service, and other purposes.

Defendant's friend, Barrett Davison, testified he helped defendant move out of the Novato apartment around June 1993. They moved clothing, shoes, a baseball card collection, "maybe a T.V.," and other personal belongings from the apartment. Defendant stored these items in Davison's garage for some time. Davison was not sure where defendant took his possessions subsequently. After June or July 1993, Davison saw defendant at the apartments of two other girlfriends, Patricia Bryant and Rosie Hurd. At Hurd's apartment, Davison saw some of defendant's property, including a television, videotape recorder, clothing, some of his baseball cards, and other "personal effects." Davison also saw defendant and some of his belongings at Bryant's apartment after June or July 1993.

Rosie Hurd testified that she and defendant decided to live together in July 1993. They resided together in Richmond from July 9, 1993, to September 12, 1993, thereafter moving to El Cerrito. Defendant brought his clothes, a television set, a golf game, and photo albums when he came to live with her. He did not, however, sign a lease with Hurd or share living expenses with her. According to Hurd, defendant received mail at their address in El Cerrito, but it had all been lost. Hurd acknowledged that during the time she lived with him, defendant would stay away overnight a couple of times a week. She did not know where he went on these occasions, and she did not inquire.

Defendant testified that after a conviction for spousal abuse in 1987, he attended a drug and alcohol rehabilitation program. He was diagnosed as bipolar manic depressive and takes prescribed medication for that condition. Defendant met Barker in 1991. They lived together in Menlo Park and then moved to Novato in September 1992, where they signed a one-year lease on an apartment. Defendant admitted that he and Barker were living together as late as May 1993. After an incident that month, defendant told Barker that he thought they should separate but still maintain their relationship. According to defendant, he moved out of the Novato apartment at the end of June 1993 with Davison's help. That month, he also met and became sexually involved with Hurd. He did not tell Barker he was living with Hurd, nor did he give Barker the telephone number at Hurd's residence. Defendant admitted he continued to receive his mail at Barker's Novato apartment, saw her "at least" twice a week, and continued to have a sexual relationship with her.

According to defendant, in August 1993, he got into an argument with Barker about a former boyfriend of hers. Defendant admitted that in the course of this argument, he bent over Barker's face and deliberately hit the top of her right eyebrow with his teeth. Soon after this incident, he discovered that Barker had changed the locks on the apartment when he arrived

there without prearrangement. He beat on the door. Angry, he went to a neighborhood store to telephone her. There, he was contacted by Officer Spengler. Defendant acknowledged telling Spengler that the apartment was his, that he paid the rent, that his name was on the lease, and that Barker could not keep him out. Defendant testified he told Spengler this "because, you know, at that time of night in that area, I didn't want to be just a somebody banging on someone's door." Defendant was arrested and spent the night in jail. Defendant also admitted he blackened Barker's eye in November 1993. He denied living with Barker at the time but admitted he was still seeing her at least twice a week. They argued over other women in defendant's life and Barker's demand for more of his time.

Under cross-examination, defendant acknowledged he did not change his address with the Department of Motor Vehicles until sometime in 1994. He continued to receive his bank statements, automobile insurance, unemployment checks, and other mail at the Novato apartment. He gave that address to the College of Marin while he was attending classes there from October 1993 through January 1994. He used it as the return address on a United Parcel Service shipment to his son, and as his address while attending a conference in Sunnyvale in November 1993. He claimed Barker suggested he continue to use the Novato address on his mail. Defendant also admitted that after Barker secured the restraining order in February 1994, he attempted to retrieve some personal possessions that were still at the Novato apartment. These included his baseball card collection, television set, videotape recorder, telephones, and other valuable items. Defendant acknowledged that, while living with Barker, he only took some clothes and other "necessities" on nights when he left the apartment.

In rebuttal, Barker denied ever talking with defendant about his moving out or living elsewhere. She never agreed he could live elsewhere yet continue to receive his mail at her apartment, and she never told him to maintain her apartment as his mailing address. Barker identified medication that defendant received in December 1993, which he kept in the Novato apartment. She testified she spent Christmas 1993 with him and identified a photograph of the two of them in front of a Christmas tree at his sister's home.

The jury found defendant guilty on multiple offenses, including four counts of inflicting corporal injury on a cohabitant. Three of these offenses are alleged to have occurred at a time when defendant asserts he was residing elsewhere. The trial court sentenced defendant to a total prison term of seven years, based on a four-year aggravated term for assault with force likely to produce great bodily injury and three consecutive one-year terms

for the counts of inflicting corporal injury on a cohabitant that defendant disputes here. The trial court stayed sentence on the remaining two counts under section 654. This appeal followed.

## Discussion

■ The only issue on appeal is whether the trial court erred in responding to jury questions about cohabitation.

The trial court read the jury this version of CALJIC No. 9.35, tailored to the facts of the case: "Every person who willfully inflicts upon a person of the opposite sex, with whom he is cohabitating [*sic*], bodily injury resulting in a traumatic condition, is guilty of a violation of section 273.5 of the Penal Code, a felony. [¶] . . . [¶] Cohabitating [*sic*] means an unrelated man and woman living together in a substantial relationship manifested principally by a [*sic*] permanence, or sexual, or amorous intimacy. Holding oneself out to be the husband or wife with [*sic*] of the person with which one is cohabitating [*sic*] is not required."[5]

During deliberations later the same day, the jury sent the court a note, reading: "May we please have a legal definition of co-habitation? Can there be simu[l]taneous co-habitation at more than one residence?" In response, the trial court sent the jury the following handwritten reply: "See the definition in the jury instructions. It is a question for you to decide re whether there can be simultaneous cohabitation."

■ In reviewing a claim of error in jury instructions in a criminal case, this court must first consider the jury instructions as a whole to determine whether error has been committed. (*People* v. *Epps* (1973) 34 Cal.App.3d 146, 168 [109 Cal.Rptr. 733]; *People* v. *Nichols* (1967) 255 Cal.App.2d 217, 222-223 [62 Cal.Rptr. 854].) We may not judge a single jury instruction in artificial isolation, but must view it in the context of the charge and the

---

[5]As reported in the transcript, the trial court used the word "or" in stating that cohabitation is "manifested principally by . . . permanence, *or* sexual, or amorous intimacy." (Italics added.) Assuming the transcript is correct, the oral instruction was erroneous. There is no authority supporting the concept that a casual sexual relationship is sufficient to establish cohabitation without the necessary element of "permanence." For this reason, CALJIC No. 9.35 conjoins "permanence" with "sexual or amorous intimacy" by use of the word "and." The court's written instructions accurately set forth the correct CALJIC instruction requiring "permanence *and* sexual or amorous intimacy" for purposes of cohabitation. (Italics added.) The record shows the trial court provided the jury with written instructions and directed the jury to refer specifically to a properly tailored version of the instruction. In light of these events, the reported error in the oral instructions was not prejudicial. (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 137-139 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Garceau* (1993) 6 Cal.4th 140, 189-190 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

entire trial record. (*People* v. *Haskett* (1990) 52 Cal.3d 210, 235 [276 Cal.Rptr. 80, 801 P.2d 323].) An appellate court cannot set aside a judgment on the basis of instructional error unless, after an examination of the entire record, the court concludes that the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) A miscarriage of justice occurs only when it is reasonably probable that the jury would have reached a result more favorable to the appellant absent the error. (*People* v. *Wharton* (1991) 53 Cal.3d 522, 571-572 & fn. 10 [280 Cal.Rptr. 631, 809 P.2d 290]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Epps, supra,* at p. 168; *People* v. *Ramirez* (1969) 2 Cal.App.3d 345, 357 [82 Cal.Rptr. 665]; 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2950, p. 3623.)

■ The trial court has the primary duty to help the jury understand the legal principles it is asked to apply. (*People* v. *Thompkins* (1987) 195 Cal.App.3d 244, 250-251 [240 Cal.Rptr. 516].) In *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1212 [275 Cal.Rptr. 729, 800 P.2d 1159], the Supreme Court held that section 1138 imposes on the trial court a mandatory "duty to clear up any instructional confusion expressed by the jury. [Citations.]" However, the standard does not require trial court elaboration on the standard instructions in every instance. When the original instructions are full and complete, the trial court has discretion to determine what additional explanations are sufficient to satisfy the jury's request for information. (51 Cal.3d at p. 1213.) Jury questions can present a court with particularly vexing challenges. The urgency to respond with alacrity must be weighed against the need for precision in drafting replies that are accurate, responsive, and balanced. When a question shows the jury has focused on a particular issue, or is leaning in a certain direction, the court must not appear to be an advocate, either endorsing or redirecting the jury's inclination. Although comments diverging from the standard should be embarked on with care, a trial court must do more than figuratively throw up its hands and tell the jury it cannot help. It must consider how it can best aid the jury and decide whether further explanation is desirable, or whether the reiteration of previously given instructions will suffice. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].)

■ In response to the jury's questions here, the trial court directed the jury to the definition of cohabitation previously given. By advising the jury to reread the cohabitation instruction, which was full and complete for purposes of the facts before it, the trial court fulfilled its duty under section 1138. (*People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1213.)

The issue is whether the trial court erred in also telling the jury that "[i]t is a question for you to decide . . . whether there can be simultaneous

cohabitation." This statement appears to tell the jury *either* that (1) the issue of simultaneous cohabitation was a factual one for it to resolve, *or* (2) to decide whether "cohabitation" as defined in the instruction could ever be "simultaneous" and then apply its decision on this abstract question to the facts of this case.

The People argue for the first interpretation of the trial court's statement. Under their analysis, the *law* does not preclude a finding of simultaneous cohabitation. As long as the evidence establishes that defendant is cohabiting with the victim at the time of the incidents in question, it is immaterial that he may be cohabiting with others as well. Defendant argues for the second interpretation of the trial court's statement, concluding the trial court erroneously left for the jury's decision a critical question of *law*. Defendant asserts that as a result of this error, the trial court "created a reasonable probability the jury would have acquitted [defendant]" of the charges related to the incidents that took place after June 1993, when he claims to have moved out of the Novato apartment he shared with the victim.

The trial court's response to the jury in this case is strikingly similar to the one the Supreme Court found erroneous in *People* v. *Beardslee, supra,* 53 Cal.3d 68. Here, as in *Beardslee,* the trial court's reply effectively told the jury the court could not help answer the question the jury had posed. (*Id.* at pp. 96-97.) We agree with defendant that the trial court did not simply tell the jury that the question was a factual one for it to decide. In reply to the jury's specific question, "Can there be simu[l]taneous co-habitation at more than one residence," the trial court did *not* say, "It is a question for you to decide whether there *was* simultaneous cohabitation based on the facts *in this case.*" Instead, the trial court specifically instructed the jury that it was to decide "whether there *can be* simultaneous cohabitation." (Italics added.) This reply to the particular question posed by the jury improperly left the jury with the responsibility for deciding a question of law and was a violation of the trial court's mandatory duty to help the jury understand the legal principles involved in the case. (*Beardslee, supra,* at p. 97.)

However, our inquiry does not end here. As the Supreme Court stated in *People* v. *Beardslee,* a violation of section 1138 does not warrant reversal unless there is a showing of prejudice. (53 Cal.3d at p. 97.) Under the circumstances presented in this case, the trial court's erroneous admonition could not have prejudiced defendant.

As noted above, the trial court did provide a proper definition of cohabitation, taken from CALJIC No. 9.35 and based on the language of *People* v.

*Holifield* (1988) 205 Cal.App.3d 993, 1000 [252 Cal.Rptr. 729] (*Holifield*). In convicting defendant as charged, the jury must have decided whether simultaneous cohabitation can exist. If the jury determined that simultaneous cohabitation *cannot* exist, its convictions indicate it did not believe the defense evidence and concluded instead that defendant was cohabiting exclusively with Barker at the time of the disputed incidents. There was more than adequate evidence in the record to support this conclusion. Under this interpretation of the jury's verdict, there was clearly no prejudice from the trial court's response to the jury's question.

On the other hand, if the jury concluded that simultaneous cohabitation *can* exist, we cannot assume that the jury rejected the defense testimony that defendant moved out of the Novato apartment in June 1993 and took up residence with Hurd. To the contrary, the jury may have found that defendant lived with both Barker and with Hurd during the same time period. In that case, the jury's conviction stands on a *legal* conclusion that a person may simultaneously cohabit with two or more individuals at different locations. We must, therefore, determine whether simultaneous cohabitation may exist as a matter of law for purposes of conviction under section 273.5.

The few cases that have considered the meaning of the term "cohabitation" as used in section 273.5 have interpreted it broadly, refusing to impose any requirement of a "quasi-marital relationship." (*Holifield, supra,* 205 Cal.App.3d at p. 1000; see also *People* v. *Ballard* (1988) 203 Cal.App.3d 311, 316-319 [249 Cal.Rptr. 806] (*Ballard*).) In rejecting a challenge that the term "cohabit" was unconstitutionally vague, the *Holifield* court ruled: "Therefore, 'cohabiting' under section 273.5 means an unrelated man and woman living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy." (*Holifield, supra,* at p. 1000.) The court amplified its view by noting: "We do think that section 273.5 requires something more than a platonic, rooming-house arrangement. *Ballard* speaks of a 'significant relationship' by analogy to the domestic violence act provisions [§§ 13700-13731]. (*Ballard, supra,* 203 Cal.App.3d 311, 318.) Because those provisions appear limited to amorous and/or sexually intimate relationships (§ 13700, subd. (b)), it is logical to ascribe a similar limitation to section 273.5. Section 273.5's requirement of a man-woman relationship further supports this view. Thus, we reject defendant's concern that viewing 'cohabiting' as anything less than a quasi-marital relationship would broadly encompass all men and women who live together, including sisters and brothers, or boarders." (*Holifield, supra,* at p. 999.)

Both *Ballard* and *Holifield* speak in terms of a man and woman living together because, before 1994, the relevant portion of the statute encompassed only persons "of the opposite sex." In that year, the Legislature

deleted the reference to persons of the opposite sex, thus criminalizing infliction of injury upon a spouse or "any person with whom he or she is cohabiting." (Stats. 1994, First Ex. Sess., 1993-1994, ch. 28, § 2.) It remains an open question how broadly the amendment extends the statute. In deleting the reference to a man-woman relationship, it appears the Legislature intended to extend its protection to domestic partners, regardless of gender. The lawmakers did not, however, indicate any intention to broaden the scope of the statute to include persons who chose to live together in relationships other than those characterized by permanence and sexual or amorous intimacy.

The courts have not explicitly addressed the issue of whether a defendant who maintains substantial relationships with more than one person at a time may be subject to prosecution for infliction of injury on one of those persons with whom the defendant resides only intermittently. The definition given in *Holifield* states that the parties must be "living together." (205 Cal.App.3d at p. 1000.) It does not speak to the issue of exclusivity in the arrangement. The element of "permanence" in the definition refers only to the underlying "substantial relationship," not to the actual living arrangement. The question is whether the concept of "permanence" necessarily carries with it a requirement of exclusivity. We conclude that it does not.

Under the CALJIC No. 9.35 definition of "cohabiting," there is no logical or practical reason why a defendant could not cohabit with two people at once, by maintaining two substantial relationships with two separate persons in two separate residences and dividing his time between the two. Indeed, the existing case law supports this interpretation. In both of the leading cases, the appellate courts upheld findings that the defendants cohabited with their victims even though in neither case was the victim's home the defendant's sole residence. Thus, in *Ballard, supra*, although the defendant and the victim had been "living together" for two years, the defendant maintained his own separate apartment. (203 Cal.App.3d at p. 314.) The fact that the two were " 'together a lot' " and " 'lived together in one bed' " in a "significant relationship" was held sufficient to establish cohabitation. (*Id.* at pp. 314, 317-318.)

Similarly, in *Holifield, supra*, the victim alone paid the rent on the motel room where she had lived for about a year. She and the defendant had been seeing each other "off and on" for four years. During the three months before the assault, the defendant stayed in at least three other places for weeks at a time, taking his possessions with him whenever he left. He kept clothing and personal possessions stored at three other residences and did

not have a key to the victim's room. The couple did not share rent or make joint purchases, did not spend much free time together, and had " 'infrequent' " sexual relations. The victim described her relationship with the defendant as one of friends or roommates and not " 'intimate.' " (205 Cal.App.3d at pp. 995-996.) On these facts, the appellate court upheld a finding that the couple was cohabiting. (*Id.* at p. 1002.)

Neither *Ballard* nor *Holifield* dealt with the precise factual situation presented here, in which defendant arguably maintained substantial relationships with two women in different locations during the same time period. Nevertheless, we conclude that the evidence supporting a finding of cohabitation is even stronger in this case than in *Holifield* or *Ballard.* Defendant and Barker were involved in a sexual relationship for several years. The two shared the lease of the Novato apartment. Even after defendant started spending a significant amount of time with other girlfriends, he retained a key to the Novato apartment and continued to use that address for his mail, driver's license, car insurance, and unemployment checks. He also used the address when registering at college and at a hotel. Although defendant took some of his clothing and "necessities" with him whenever he spent time away from Barker, he left numerous other possessions in the Novato apartment. He stayed with Barker at least twice a week and continued his intimate relationship with her. When Barker locked defendant out of the Novato apartment in August 1993, he told the police that the apartment was his, he paid for it, and Barker had no right to lock him out. Thus, there was a great deal of evidence that defendant continued to live with Barker, although not exclusively, and that he maintained a substantial relationship with her even after he started new relationships with others.

We conclude as a matter of law that for purposes of criminal liability under section 273.5, a defendant may cohabit simultaneously with two or more people at different locations, during the same time frame, if he maintains substantial ongoing relationships with each and lives with each for significant periods. A defendant who physically abuses a cohabitant cannot immunize himself from criminal liability merely by living part-time elsewhere with one or more other persons while continuing to reside the rest of the time with the first partner and maintaining a substantial relationship with that person. On the factual record of this particular case, there is sufficient evidence to support the jury's finding that defendant was cohabiting with the victim at the time of the subject incidents, whether or not he was simultaneously cohabiting with one or more other women. Thus, although the trial court erred in leaving to the jury the essentially legal question of whether there *can* be simultaneous cohabitation, there was no possible prejudice in this case.

*Disposition*

The judgment is affirmed.

Parrilli, J., and McGuiness, J.,* concurred.

A petition for a rehearing was denied May 24, 1996, and the opinion was modified to read as printed above.

---

*Judge of the Alameda Superior Court sitting under assignment by the Chairperson of the Judicial Council.