Filed 11/18/13  P. v. Miller CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>WINSTON MILLER,<br><br>　　　Defendant and Appellant. | B244497<br><br>(Los Angeles County<br>Super. Ct. No. GA084445) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County. Jared D. Moses, Judge.  Affirmed.

　　　Frank Duncan for Defendant and Appellant.

　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Winston Miller was convicted of corporal injury to a former cohabitant (Pen. Code, § 273.5, subd. (a)),[1] criminal threats (§ 422), and assault with a semiautomatic firearm (§ 245, subd. (a)(2)). The jury found that appellant personally used a firearm. Appellant admitted prior conviction and prison term allegations. He was sentenced to a total of 21 years and four months in state prison.

On appeal, appellant contends that there was insufficient evidence to support the conviction and that key evidence was wrongly suppressed. We affirm.

## FACTS

**Prosecution Evidence**

Jacqueline H. knew appellant since 2005. They first became romantically involved while Jacqueline was married to another man. Jacqueline got pregnant and had a daughter, A.G., in December 2005. Jacqueline believed that appellant was the father of A.G., though no paternity test was administered.

According to Jacqueline, from summer 2007 to early 2008 she and appellant lived together. Appellant held himself out as A.G.'s father, the couple lived together with A.G. as if appellant was her father, and Jacqueline presented appellant as A.G.'s father. Appellant helped to support the family, paid for rent, and made car payments. He beat Jacqueline numerous times, but she did not contact the police because she loved him and wanted to maintain a family. She and appellant broke up in 2008, however, and did not see each other again until August 2011.

On August 12, 2011, at around 5:00 p.m., Jacqueline received a call from appellant. He said that he wanted to see A.G., and asked Jacqueline to come get him in her car. Jacqueline picked up appellant in Los Angeles around 10:00 p.m. and drove him to her apartment in Duarte. She noticed that appellant had a gunshot wound to his hand. After they arrived in Duarte, Jacqueline, who is a vocational nurse, treated the gunshot wound. Later, appellant talked to A.G., went to bed with Jacqueline, and had sex.

---

[1]    Unless otherwise noted, further statutory references are to the Penal Code.

2

On the morning of August 13, at around 9:00 a.m., Jacqueline and appellant were in bed when he received a phone call.  Appellant was arguing on the phone using foul language when A.G. came into the room.  Jacqueline asked him to hang up the phone, and he did.

Later that day, at around 2:00 p.m., appellant received another call and again proceeded to curse out the individual on the other end.  Jacqueline asked him to stop, but he told her she needed to "stay in [her] place."  He hit her in the face with a closed fist and then grabbed her by her hair and punched her again.  Jacqueline was on the ground curled up, but appellant continued to hit her in the head and arms.  A.G. came into the room and tried to stop him.  Eventually, he stopped hitting Jacqueline because his hand hurt.

Jacqueline told appellant to get out of her house.  Appellant told her to take him to Los Angeles, but she refused.  She also refused to tell appellant the address of her apartment.

Appellant and Jacqueline went into her living room, arguing and yelling. Appellant sat on a couch and Jacqueline went to lie down on a smaller sofa, opposite him. Appellant pulled a gun out of his jacket and shot, hitting the smaller sofa.

A.G. came into the room.  Jacqueline told her to go to the downstairs neighbor's apartment, and she did.  Appellant walked back and forth through the living room with the gun in his hand.  He got a phone call and told the person on the other line, "I hate that bitch.  I'm about to kill her."  He hung up the phone, pointed the gun at Jacqueline, and asked her which of her legs he ought to shoot.

Eventually, appellant walked out of the apartment without firing another shot. Jacqueline noticed a shell casing on the floor and picked it up.  She then grabbed her purse, phone, and car keys, hurried down to the neighbor's apartment to collect A.G., and then drove to the sheriff's station.

Jacqueline reported the incident and gave a handwritten statement at the sheriff's station.  She handed over the shell casing.  Deputy Castro, who took her statement, described her as nervous, scared, and irate.  She described appellant's weapon, which

3

resembled a .22-caliber semiautomatic handgun.  Deputy Castro observed bruising on the left side of her face.

Deputy Castro drove to Jacqueline's apartment complex.  He interviewed the downstairs neighbor, who told him that she heard arguing in Jacqueline's apartment and heard her yell, "No, please stop," "Don't hit me," and "Don't touch me."  She heard two popping sounds that could have been gunshots.  She further stated that several women came to pick up appellant and drove him away.

Deputy Castro examined Jacqueline's apartment.  He found strips of gauze soaked with blood and iodine.  When he examined the sofa, he saw a bullet hole in one of the arms and noticed splintered wood behind the hole.  The hole was the same size as the shell casing.  A .22-caliber bullet was extracted from the sofa.  Deputy Castro did not notice any smell that would indicate a gun had been fired in the apartment.  Two firearm examiners testified, however, that it is common not to smell gunpowder after a gun is fired in a room.

**Defense Evidence**

Appellant testified in his own defense.  He admitted that, as a juvenile, a petition was sustained against him for unarmed robbery and that, as an adult, he was convicted of felony domestic violence and forgery.  While he was in prison on the domestic violence conviction, he took a 52-week anger management course.

Appellant met Jacqueline in 2005, when she was married.  They had sex but did not have a relationship.  They saw each other for approximately three weeks.

In 2006, appellant was sent to prison.  While there, he sent Jacqueline two letters acknowledging that he was the father of A.G.  He believed that he was the father because Jacqueline told him that three other men had paternity tests, and their tests were all negative for paternity.

Appellant started seeing Jacqueline again in 2007, once he was out of prison.  They had a friendly relationship, but not one that was "spousal-like."  They had sex from time to time.  They never lived together.

4

Appellant stopped seeing Jacqueline sometime in 2007. He did not see her again until August 12, 2011. She picked him up that night about 10:30 and took him to her apartment where she treated his wound. He was sick and vomiting due to the severity of the injury. He was too sick to even think about having sex with her, and he slept at the foot of her bed.

He woke up the next morning around 9:00 a.m. Jacqueline offered him breakfast, but he was too sick to eat. Appellant's fiancée called on his cell phone to ask where he was. Jacqueline heard him talking to his fiancée and got angry, asking him, "Why [didn't you] have that bitch come get you last night when you were shot?" and chastising him for playing with her feelings. Jacqueline and appellant argued and Jacqueline screamed into appellant's phone, "He's at his baby momma house, bitch." Appellant hung up the phone, and the argument continued for about an hour.

After about a half hour of calm, appellant and Jacqueline started arguing again. Jacqueline spit and threw a plant at appellant. She grabbed his phone and threw it and told him to get out of her house. He asked for the address so he could be picked up, but she refused to give it to him. Appellant tried to ask a neighbor for the address, but Jacqueline told the neighbor not to give the address, warning that she was a "Harlem Crip."

Appellant never struck Jacqueline. He was still in pain and vomiting from being shot. He also did not pull out a gun, as he did not even have a gun. He left Jacqueline's apartment about 1:00 p.m. He saw her walk past him and go into the downstairs neighbor's apartment. His fiancée eventually came to pick him up to drive him home. About an hour after picking him up, appellant's fiancée had to pull over to the side of the freeway so that appellant could vomit. While the car was stopped, Jacqueline called on the phone. She told appellant he was going to be detained by the police. About four days later, appellant was arrested.

5

## DISCUSSION

### I. Sufficiency of the Evidence

Appellant makes two primary challenges regarding the sufficiency of the evidence. First, he contends that there was insufficient evidence of cohabitation, an element of corporal injury to a former cohabitant under section 273.5, subdivision (a). Second, he argues that Jacqueline's testimony was excessively inconsistent, and given the totality of the circumstances a reasonable jury could not have found appellant guilty beyond a reasonable doubt.

"The standard of appellate review for determining the sufficiency of the evidence is settled. '"On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) The due process clause of the Fourteenth Amendment of the United States Constitution protects a defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364.) In *Jackson v. Virginia* (1979) 443 U.S. 307, the United States Supreme Court held that the critical inquiry on review of the sufficiency of evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. (*Id.* at pp. 318-319.)

#### A. Former cohabitant

In arguing that there was insufficient evidence of cohabitation, appellant asserts that evidence that the parties had lived together was slight and did not constitute cohabitation under the law. Section 273.5, subdivision (a) provides in pertinent part that a person who willfully inflicts "corporal injury resulting in a traumatic condition" on a "former cohabitant" is guilty of a felony. The cohabitation requirement is interpreted "broadly"; a finding of cohabitation does not require proof of a "'quasi-marital relationship.'" (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1333.) "[S]omething

6

more than a platonic, rooming-house arrangement" is required, though. (*People v. Holifield* (1988) 205 Cal.App.3d 993, 999 (*Holifield*).) "Cohabiting" refers to "an unrelated man and woman living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy." (*Id.* at p. 1000.) Factors relevant to determining cohabitation include: 1. sexual relations between the parties; 2. sharing of income or property; 3. joint use or ownership of property; 4. whether the parties hold themselves out as husband and wife; 5. the continuity of the relationship; and 6. the length of the relationship. (*Id.* at p. 1001.)

In *Holifield*, the victim testified that the defendant occasionally stayed with her in her motel room over a three-month period, and then in the two weeks preceding the assault stayed with her continuously. (*Id.* at p. 996.) They had "'infrequent' sex." (*Ibid.*) The victim felt emotionally attached to the defendant, but the feeling was not returned. (*Ibid.*) The two did not share rent, make joint purchases, or hold themselves out as man and wife. (*Ibid.*) Nevertheless, the Court of Appeal held that there was enough evidence for the jury to find an "ongoing relationship of 'some permanency,'" and thus the element of cohabitation was satisfied. (*Id.* at p. 1002.)

Under this standard, there was clearly sufficient evidence to find that appellant and Jacqueline were former cohabitants. Jacqueline testified that from summer 2007 to early 2008 she and appellant lived together. She further testified that appellant paid for rent and assisted in the purchase of a car, that the couple lived with A.G. as if appellant was A.G.'s father, and that Jacqueline presented appellant as A.G.'s father. Appellant himself testified that during this period, he and Jacqueline would have sex. The jury could reasonably have found that appellant and Jacqueline had a previous ongoing relationship of some permanency and were therefore former cohabitants.

Appellant takes issue with the fact that Jacqueline was the only witness to testify that she and appellant lived together, while appellant himself testified that he never lived with her. "'[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we

look for substantial evidence.'" (*People v. Lee* (2011) 51 Cal.4th 620, 632.) We find no reason to overturn the jury's implied finding that Jacqueline's testimony was more credible than appellant's and the determination that the two were former cohabitants.

### B. Substantial evidence supported the other findings

Appellant further contends that Jacqueline's testimony was inconsistent and could not support a conviction. He argues that Jacqueline initially told police that appellant took the gun from his waistband, but at trial testified that the gun came from his jacket pocket; that she varied in describing the timeline of events surrounding the assault; and that her allegations of a beating were irreconcilable with the fact that appellant had been shot in the hand and was in extreme pain. Appellant also notes that Deputy Castro did not smell the odor of gunpowder when he entered her apartment and was suspicious that Jacqueline was telling the truth.

None of these asserted deficiencies in the evidence warrants reversal. "'"'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"'" (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Substantial evidence supported the finding that appellant beat Jacqueline. She testified that he grabbed her by the hair and struck in her in the face and upper body. The downstairs neighbor testified that she heard Jacqueline screaming at appellant to stop. When Deputy Castro first spoke to Jacqueline, he observed bruising on the left side of her face.

Substantial evidence also supported the findings that appellant made criminal threats and committed assault with a semiautomatic firearm. Jacqueline testified that appellant, while talking on the phone, said that he was going to kill Jacqueline, and that afterward appellant pointed a gun at her and asked her which leg he should shoot. She also testified that while she was lying on the sofa, appellant pulled out a gun and shot. The downstairs neighbor heard two popping sounds that could have been gunshots. A .22-caliber bullet was extracted from the sofa, and a shell casing was found that matched

8

the caliber of bullet.  Furthermore, although Deputy Castro did not notice any smell that would indicate a gun had been fired in the apartment, two firearm examiners testified that it is common not to smell gunpowder after a gun is fired in a room.

Again, it was within the province of the jury to determine which witnesses were credible.  (*People v. Lee*, *supra*, 51 Cal. 4th at p. 632.)  Although Jacqueline's testimony may have been inconsistent in some respects, it was not so inconsistent as to render it not credible, particularly when one considers that she was likely highly agitated given the gravity of the situation.  The jury was presented with sufficient evidence to convict appellant; we are not in the position to second-guess its judgment.

## II. Exclusion of Evidence

Finally, appellant contends that the trial court committed reversible error by excluding from evidence a recording of a jailhouse telephone call between Brandon Maxwell, an alleged "Harlem Crip" gang member being held on a murder charge, and Jacqueline.  During the telephone call, Jacqueline told Maxwell that appellant pulled a gun in her house and tried to kill her and A.G.  She said that A.G. cut her own hair off because she was scared that appellant would kill her and she wanted to disguise herself.  Maxwell responded that when he ran into appellant in jail, he was going to "check him."  Most of the phone call, however, had nothing to do with the instant case.  Instead, Maxwell talked extensively about his own criminal case and his communications with his lawyer, and he and Jacqueline discussed the affairs of various mutual acquaintances.

The trial court excluded the recording under Evidence Code section 352 on the basis that the content was largely irrelevant, could cause "tremendous prejudice," would be time-consuming, and would tend to mislead or confuse the jury.  Appellant argues that the recording was relevant because Jacqueline stated that appellant tried to kill both her *and* her daughter (contrary to her testimony that appellant only shot at her), and because it showed the depth of Jacqueline's animosity toward appellant, since she vociferously complained about appellant to a gang member in jail for murder who promised to "check" appellant.

We review the trial court's exclusion of evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Holloway* (2004) 33 Cal.4th 96, 134.) The trial court may "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code § 352.)

We find no abuse of discretion in the trial court's order. As the trial court correctly noted, the bulk of the conversation had nothing to do with appellant, and therefore playing the recording for the jury would have necessitated an undue consumption of time. There was also a substantial danger of undue prejudice or confusion. It is likely that the jury would have been led to speculate whether Maxwell ever carried out his promise to "check" appellant—a consideration completely irrelevant to the issue of whether appellant committed the crimes for which he was charged.

Moreover, appellant fails to show that the recording had more than slight, if any, probative value. Although Jacqueline may have demonstrated animosity toward appellant in the recording, her anger appeared to arise from the fact that appellant pulled a gun on her in her own house. Appellant does not explain how the jury could have found this anger relevant to the issue of whether appellant committed crimes against Jacqueline. Nor did the recording have any tendency to show that Jacqueline testified untruthfully. In both the jailhouse recording and her trial testimony, Jacqueline stated that appellant assaulted her with a firearm. She may have embellished the story when talking with Maxwell by stating that appellant also threatened A.G., but, on the issue of appellant's conduct toward Jacqueline, the recording was consistent with her trial testimony.

10

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

BOREN, P.J.

We concur:

ASHMANN-GERST, J.

FERNS, J.*

_____

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11