Filed 12/11/24  P. v. Hachee CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CAROLINE ANNE HACHEE,<br><br>    Defendant and Appellant. | F086209<br><br>(Super. Ct. No. F22903718)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Caroline Anne Hachee lived with M.H. and, after assaulting him, a jury convicted her of inflicting corporal injury on a cohabitant or person with whom she had a dating relationship and other charges.  Defendant argues that the evidence established that she was M.H.'s roommate but was insufficient to establish a substantial relationship

manifested by permanence and sexual intimacy within the meaning of the term "cohabitant." We affirm.

## PROCEDURAL BACKGROUND

The District Attorney of Fresno County charged defendant on September 14, 2022, with second degree robbery (Pen. Code,[1] § 211; count 1), corporal injury to a cohabitant or person in a dating relationship[2] (§ 273.5, subd. (a); count 2), resisting an executive officer (§ 69; count 3), and resisting a peace officer or emergency medical technician (§ 148, subd. (a)(1); count 4). Defendant pleaded not guilty. The jury convicted defendant of counts 2 through 4 but acquitted her of count 1 on March 30, 2023, after a five-day trial.

At the sentencing hearing on April 28, 2023, the trial court suspended imposition of sentence and admitted defendant to concurrent probation terms of three years as to count 2 and two years as to count 3[3] and sentenced defendant to 64 days credit for time served as to count 4. The court ordered defendant to pay victim restitution in the amount of $472.72 (§ 1202.4, subd. (f)),[4] a $300 restitution fine (§ 1202.4), a $300 probation revocation restitution fine (§ 1202.44), a $500 domestic violence fee (§ 1203.097),[5] a $40 court operations assessment (§ 1465.8), and a $30 criminal conviction assessment (§ 70373).

---

[1] Undesignated statutory references are to the Penal Code.

[2] The information alleged corporal injury to a "SPOUSE, COHABITANT, FIANCE, IN A DATING RELATIONSHIP, CHILD'S PARENT," but the jury instructions limited the relationship to her cohabitant or a person with whom she had a dating relationship.

[3] We note that the April 28, 2023 sentencing hearing minute order incorrectly provides that the probation term as to count 3 is three years.

[4] We note that the April 28, 2023 sentencing hearing minute order incorrectly reflects victim restitution in the amount of $420.

[5] We note that the April 28, 2023 sentencing hearing minute order incorrectly provides that this fee was imposed pursuant to section 1463.27.

Defendant filed a timely notice of appeal on May 2, 2023.

## FACTS

M.H. was 69 years old at the time of trial and testified that he worked at a home improvement store. While working, he met defendant, who worked for a store vendor, in July or August 2021. After they met a second time, he began speaking with defendant on the phone and spending time alone with her to have dinner or watch television. M.H. testified that he and defendant had been romantic at times, and when defendant moved out of her ex-boyfriend's home in September 2021, M.H. encouraged her to move in with him.

M.H. met defendant's daughter when she stayed over with defendant, and they all spent Thanksgiving and Christmas together in 2021. M.H. also took defendant to dinner for Valentine's Day at a nice restaurant in 2022 and retained a photograph from the evening. M.H. paid for himself and defendant to vacation in Hawaii in November 2021, spent two days with her in Napa in March 2022, and took her on a trip down the coast to Cambria and Pismo. In January 2022, M.H. also cosigned on a loan for a vehicle defendant purchased because defendant was not able to obtain credit on her own.

M.H. had a relationship with defendant that was affectionate at times, and they hugged and kissed, although defendant sometimes turned away when he attempted to kiss her. By time of the incident, M.H. said the relationship was "going downhill." Approximately two weeks before, M.H. had friends visit to assist him in asking defendant to move out, but she refused to leave.

Defense counsel presented evidence that M.H. told police at the time of the incident that defendant was not his wife but "a live-in," she was "just a friend," and they went on trips but were not dating. M.H. did not remember making those statements. When the officer clarified that M.H. and defendant did not have intercourse but "would have whatever kind of sex you guys would have," M.H. told the police that defendant was always drunk. M.H. also told the police that their relationship became romantic

3.

sometime in October 2021 and they were involved "on and off," but he was physically unable to have sexual intercourse. M.H. told the police, consistent with his testimony, that he took defendant on a trip to Hawaii, he took her to nice dinners, he treated her to dinner on her birthday, they stayed in Napa for a couple of days, and he took her to the coast. He also said that defendant went "back out" as soon they returned from the trips. M.H. told an officer that he wanted to be more than friends, but defendant did not.

When M.H. arrived home on March 26, 2022, defendant was out with friends. He watched television and had a couple of drinks. Defendant called from a friend's house, and the friend asked M.H. to encourage defendant to stay over because she was inebriated. Defendant later called a few times to say that she was lost. When defendant arrived home at approximately 10:00 p.m., M.H. was on the phone with defendant's friend. Defendant was angry and took M.H.'s phone from his hand.

M.H. followed defendant to her room and asked for his phone, but defendant denied having it. After asking five or six times, he reached out for it while looking around the room. Defendant took a wooden tray that was on her bed and broke it over his head, then punched his left eye with a clinched fist. She threw a vase of flowers at him as he left. M.H. walked through the laundry room toward the garage, intending to get help from a neighbor. Defendant picked up a laundry detergent bottle and struck M.H.'s head four or five times. The soap went everywhere. He fell, and she hit him with a gallon water bottle five or six times on his neck and back. M.H. told defendant that he was having chest pains and thought he was having a heart attack. Defendant went back into the house while M.H. left through the garage to seek help from a neighbor. The neighbor called 911.

After the altercation, M.H. had a black eye, gashes on his forehead and arm, and injuries from defendant's fingernails.

The responding police officers observed that defendant had been drinking but was uninjured and had a large amount of laundry detergent on her clothing. Defendant tried

4.

to run back into the house when officers attempted to detain her. She resisted arrest and was handcuffed and placed in a patrol vehicle. However, defendant slipped a handcuff and managed to use her cellphone. Because she had been aggressive, the officers did not try to take her cellphone when placing her in the vehicle. When an officer attempted to retrieve the cellphone, defendant kicked him twice in his knee. Defendant continued to resist as the officer tried to pull her to the ground from the vehicle. The officer handcuffed her again, placed defendant back in the patrol vehicle, and then drove to the hospital. Defendant continued to act belligerent, irate, and aggressive. When the officer attempted to take her outside the hospital due to her conduct, defendant kicked him again.

When interviewed by the officer, defendant said, "[M.H.] and I have been not together but together." The officer later asked if M.H. and defendant were boyfriend and girlfriend. Defendant replied, "No, we're not but he would like to be, he's very much so in love with me." She described the relationship: "According to me, we're just friends. According to him, he'd like to be more than just friends." The officer later asked defendant again if defendant and M.H. were "just friends." Defendant replied, "A little bit more." When asked if they were dating, defendant responded, "Well, no. He wants it to be more than that, but we're not, and tonight, when I didn't come home when he wanted me to, he was a little aggressive about where I was at …." The officer stated, "I just asked if you guys were dating," and defendant replied, "Well, to him, yeah. To me, no."

Defendant testified that she met M.H. at their place of employment and he was flirtatious. M.H. asked her out on a date, and defendant let him make her dinner. Defendant testified that she went on trips with M.H. and he bought her things, such as flowers. However, defendant viewed their relationship as just friends, they were not in a relationship, and she did not assault him. When cross-examined, however, defendant testified that she did go on dates with M.H., including a date on Valentine's Day that was memorialized in a photograph. She testified that she accompanied M.H. on trips to

5.

Hawaii, Napa, and the coast and spent holidays with M.H. and her daughter. She also allowed M.H. to cosign on a loan for a vehicle.

## DISCUSSION

### I. *Sufficient evidence supports that M.H. was someone with whom defendant had a dating relationship.*

#### A. Standard of Review and Applicable Law

Defendant contends there was insufficient evidence of cohabitation to support her convictions for domestic violence (§ 273.5, subd. (a)) against M.H. We conclude the evidence was sufficient that defendant had a dating relationship with M.H., an alternate basis presented to the jury to support the charge, and they were cohabitating.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; see *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].) We must accept logical inferences that the trier of fact might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) If more than one inference may reasonably be drawn from the evidence, we accept the inference supporting the judgment. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

The reviewing court need not address "assertions of conflicts in the evidence" or "alternative theories regarding the inferences that should have been drawn from the evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Section 273.5, subdivision (a) proscribes willfully inflicting corporal injury resulting in a traumatic condition upon a victim described in section 273.5, subdivision (b). The victim is required to be, as relevant here, "[t]he offender's cohabitant or former cohabitant" or "someone with whom the offender has, or previously had, … [a] dating relationship, as defined in paragraph (10) of subdivision (f) of [s]ection 243." (§ 275.5, subd. (b)(2), (3).)

Section 243, subdivision (f)(10) defines "dating relationship" as "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations." A "dating relationship" does not include a casual relationship or an ordinary fraternization between individuals in a business or social context, but does not require a serious courtship, increasingly exclusive interest, or a shared expectation of growth. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1115–1116.)

Within the meaning of section 273.5, "cohabitation" is defined as unrelated adults "living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy." (*People v. Holifield* (1988) 205 Cal.App.3d 993, 1000 (*Holifield*).) Although it is not necessary to prove "a full quasi-marital relationship," cohabitation requires "something more than a platonic, rooming-house arrangement." (*Id.* at pp. 1002, 999.) "The element of 'permanence' in the definition refers only to the underlying 'substantial relationship,' not to the actual living arrangement." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1334.) Permanence does not require exclusivity in

7.

either the relationship or the living arrangement. (*Id.* at pp. 1334–1335.) Furthermore, neither a sexual relationship nor the sharing of resources or costs is necessary to prove cohabitation. (*Holifield*, at p. 1002; see *People v. Ballard* (1988) 203 Cal.App.3d 311, 319.)

### B.    Analysis

Defendant argues that the evidence was insufficient to support the jury's verdict that she was cohabitating with M.H. within the meaning of section 273.5, subdivision (a). However, we conclude substantial evidence supports a finding that M.H. and defendant previously had been cohabitating and in a dating relationship.

The trial court instructed the jury that defendant was charged in count 2 with "inflicting an injury on her cohabitant or a person with whom she had a dating relationship that resulted in traumatic condition. To prove the defendant is guilty of this crime, the People must prove … the defendant willfully inflicted a personal [in]jury on her cohabitant or someone with whom she has or previously had a dating relationship." Therefore, the jury's verdict would be supported by evidence of either cohabitation or a prior dating relationship.

The jury in this case was instructed pursuant to CALCRIM No. 840 that the "term cohabitation means two unrelated people living together for a substantial period of time resulting in some permanency of the relationship.· Factors that may determine whether the people are cohabitating include, but are not limited to, sexual or relations between the parties while sharing the same residence, sharing of income or expenses, joint use or ownership of the property, the parties holding themselves out as domestic partners, the continuity of [the] relationship and the length of the relationship. [¶] The term dating relationship means frequent intimate associations primarily characterized by the expectation of affection or sexual involvement."

Defendant argues that she and M.H. "were roommates and nothing more." While concededly the evidence shows that both M.H. and defendant believed that as of

March 26, 2022, the relationship was no longer romantic, we conclude that substantial evidence in the record supports the jury's finding that their relationship had previously been a dating relationship within the meaning of the statutory definition, not merely a casual social relationship, and that they had been living together during that time.

The evidence certainly establishes that defendant and M.H. lived together from September 2021 until defendant's arrest on March 26, 2022. Viewing the evidence in the light most favorable to the verdict, M.H. testified that he commenced a romantic relationship with defendant in July or August 2021. The relationship began as encounters at his work and progressed to telephone conversations. M.H. and defendant both testified that their initial date involved dinner. M.H. testified that he suggested defendant move in with him when she moved out of her ex-boyfriend's residence in September 2021 and that the relationship had turned romantic by October 2021. M.H. took defendant to Hawaii in November 2021 and celebrated Thanksgiving and Christmas with her and her daughter. M.H. described the relationship as "on and off" and testified that they had, at times, hugged and kissed and been intimate, but they did not have sexual intercourse. Both defendant and M.H. testified that they made trips to Napa and the coast in March 2022. Defendant admitted that she went on "dates" with M.H., the most recent of which was on Valentine's Day in 2022.

Additionally, defendant made conflicting statements regarding her relationship with M.H. She initially told an officer that she and M.H. were more than friends, although she later claimed she just wanted to be his friend. At the time of defendant's arrest, both M.H. and defendant characterized their relationship as a friendship, but the jury could have certainly inferred that earlier in their relationship M.H. and defendant engaged in "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement." (§ 243, subd. (f)(10).) Based upon M.H.'s testimony and that of defendant, the jury could have reasonably inferred that M.H. and defendant

9.

commenced a dating relationship, moved in together, continued to date, and at some point, they diverged in their expectations of the relationship.

In *Holifield*, the defendant stayed with the victim off and on for three months. (*Holifield, supra*, 205 Cal.App.3d at p. 996.) The defendant "took his clothes and other belongings with him each time he left," and the couple "did not share rent, have a joint bank account, make joint purchases or hold themselves out as husband and wife." (*Ibid.*) The couple had " 'infrequent' sex," and the victim described their relationship as "friends and roommates," though she had romantic feelings for the defendant. (*Ibid.*) The appellate court concluded that the evidence established "an intimacy going well beyond that of ordinary roommates," which was sufficient to support the jury's finding. (*Id.* at p. 1002.)

The jury's verdict concluding that defendant and M.H. cohabitated and previously had a dating relationship is supported by substantial evidence.

## DISPOSITION

The clerk of the superior court is directed to amend the April 28, 2023 sentencing hearing minute order to reflect that a probation term of two years was imposed as to count 3, the $500 domestic violence fee was imposed pursuant to section 1203.097, and victim restitution was ordered in the amount of $472.72. The judgment is otherwise affirmed.


HILL, P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

10.