Filed 4/2/14  P. v. Jones CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAMON JONES,<br><br>        Defendant and Appellant. | A136237<br><br>(Alameda County<br>Super. Ct. No. C163702) |

On August 15, 2009, Damon Jones shot his unarmed cousin, Wayne Griffin, eight times, killing him.  When Jones was apprehended, he admitted the killing, stating that he shot Griffin in the leg after Griffin had struck him in the face and threatened to shoot him.  Jones then contemplated what he should do for about 30 seconds, after which he resumed firing at Griffin because he believed Griffin would retaliate sooner or later.

The People charged Jones with the murder of Griffin (Pen. Code, § 187), including allegations of firearm and great bodily injury enhancements.  At trial, Jones's counsel did not challenge the evidence that Jones shot Griffin, but argued that the jury should find Jones guilty of voluntary manslaughter based on imperfect self-defense.  The jury instead found Jones guilty of first degree murder and found true the allegation of personal and intentional use of a firearm, causing great bodily injury and death.

Jones makes the following assertions of error on appeal:  (1) the court erred in admitting evidence, pursuant to Evidence Code[1] section 1101, subdivision (b), that Jones

---

[1]  Unless otherwise indicated, statutory citations are to the Evidence Code.

possessed a firearm when he was arrested; (2) the court erred by instructing the jury with CALJIC No. 5.55; (3) the court erred by including within CALJIC No. 5.17 the rule that imperfect self-defense is not available if the defendant created the circumstances that legally justified his adversary's use of force; and (4) the court erred in the ordering of instructions related to self-defense and imperfect self-defense.  Jones also argues that if individual errors do not require reversal, then the cumulative effects of the errors require reversal.

We agree with Jones that CALJIC No. 5.55 and part of CALJIC No. 5.17 were not supported by the evidence and that the court erred by so instructing the jury.  However, we conclude that Jones suffered no prejudice from any of the errors he alleges and we affirm his conviction.

## BACKGROUND

### I. *Procedural Background*

On May 24, 2012, in an amended information, the People charged Jones with the murder of Griffin.  (Pen. Code, § 187.)  Attendant to the murder charge, the People alleged that Jones:  (1) personally and intentionally discharged a firearm, causing great bodily injury and death to Griffin within the meaning of Penal Code sections 12022.7, subdivision (a), and 12022.53, subdivision (d); (2) personally inflicted great bodily injury on another person within the meaning of Penal Code section 12022.7; (3) personally and intentionally discharged a firearm within the meaning of Penal Code section 12022.53, subdivision (c); and (4) used a firearm within the meaning of Penal Code sections 12022.5, subdivision (a) and 12022.53, subdivisions (b) and (g).

Trial commenced on May 29, 2012.  The jury heard evidence on five days between June 6 and June 13.  Closing arguments were presented on June 18 and the case was submitted to the jury at the end of the afternoon.  The jury reached a verdict on June 19, finding Jones guilty of murder in the first degree (Pen. Code, § 187, subd. (a)) and finding true the allegation of personal and intentional use of a firearm, causing great bodily injury and death to Griffin (Pen. Code, §§ 12022.7, subd. (a), 12022.53, subd. (d)).  On July 19, the court sentenced Jones to two consecutive terms of 25 years to life, one for

2

the murder and one for the personal and intentional use of a firearm, causing great bodily injury and death.

Jones timely filed a notice of appeal on August 9, 2012.

## II. *Factual Background*

On August 15, 2009, about 5:40 p.m., Jones shot and killed Griffin, his cousin, in the 900 block of Willow Street in the Campbell Village neighborhood of Oakland, California. The police collected ten 9 millimeter cartridge casings at the scene that had been fired from the same gun. At autopsy, Griffin's body exhibited eight bullet entry wounds and additional re-entry wounds.

On October 14, 2009, the police stopped a cab with four passengers in Richmond, California. Jones was in the front passenger seat. A handgun was found on the floorboard on the driver's side of the vehicle. Jones admitted that the handgun belonged to him, but said it was not the weapon used to kill Griffin. Jones was transported to Oakland to be interviewed by police. A recording of the interview was played for the jury at trial.

Early in the interview, Jones explained that his name had come up in the Griffin shooting because of his reputation with guns: "That shit stay coming up man. That's how that shit be man. When you play with guns man. You got a reputation with that shit man, shit stay coming up. [¶] . . . [¶] . . . My shit going to stay coming up even when I'm locked up. You all still gonna hear about me." Jones said that people were scared of him for good reason: "Yeah it's for good reason. That's what I'm saying, like, shit, people mess with me they know I'm gonna come, cause I, um, cause I been shot already, people say they all trying to kill me. I'm gonna to come look for you, before you look for me."[2]

---

[2] A police officer testified at trial that Jones's comments about his street reputation were supported by the fact that he had a conviction in 2009 for possession of an assault weapon. Evidence concerning Jones's character for violence was admissible under section 1103, subdivision (b), because the defense had questioned prosecution witnesses concerning Griffin's character for violence, beginning with the second witness, Norman Montalvo.

Jones initially denied being present when Griffin was shot.  He told police that three weeks before Griffin was shot, he had been in a fight with Griffin's brother, Dale Gibson, who threatened to break the window of his car.  The fight concerned Gibson's coat, which a friend of Jones had taken and which had money in a pocket.  Jones told police that about a week later, Griffin started a fight with him about Gibson's jacket and a friend broke up the fight.

About two-thirds of the way into his three hour interview with police, Jones said he would tell the officers "everything" and admitted shooting Griffin.  The fight between Jones and Griffin began when Jones asked Griffin for a "Swisher" and Griffin replied that Jones had money and could buy his own.[3]  Jones began to walk away, but Griffin walked up behind him and slapped him in the face, telling Jones "he ain't gonna do me how [Jones] did [his] brother."

During the fight, Griffin said he would shoot Jones in the face.  Jones told police: "Doing all that, you feel me, keep—keep, like you say embarrass me, beat me up and shit, hella shit.  Had my gun on me man.  Took it out.  Yeah right there.  He say he's gonna kill me.  I know what type of nigger he is.  So I had to take my shit out man.  And—and—and do that, that was it."  Jones said that he had the gun on his person and did not retrieve it from his car.

Jones told the police that he first shot Griffin in the leg.  Griffin dropped and said, "Bitch ass nigga, Stop!  Stop!  Stop!  . . . You gonna do me like that?"  Jones told police, "I stopped and I thought I gotta do it, man.  Now you know where I live."  When asked why he thought he "had to do it at that point," Jones answered:  "Cause he had threatened.  He a bully.  And shit.  You feel me?  The dude know where I stay at.  You know where I lay my head, my personal head, you feel me.  I don't trust nigger.  This nigger looked straight at me and said he gonna shoot me in my face."  Jones knew that Griffin was not armed at the time, but he was afraid because Griffin "can get a gun."

---

[3] Jones' reference to a "Swisher" appears to be to a cheap cigar whose contents are removed and replaced with marijuana.  (See fn. 5, *post*, and http://www. urbandictionary.com/define.php?term=swisher.)

After he shot Griffin in the leg and Griffin fell to the ground, Jones thought about what to do for about 30 or 35 seconds.  Jones resumed firing at Griffin because, "[Griffin] gonna come, probably gonna come for my kids and anything, baby momma, anything. [¶] . . . [¶]  Cause at the point I just can't back down.  That nigger I can't back, just—just go.  If he know who got him he gonna come man he crazy—he crazy."

Norman Montalvo testified that he saw Jones and Griffin fighting as he walked to work.  Griffin was "beating [Jones] up" and Montalvo thought that Griffin was "getting the best" of Jones.  He heard Griffin tell Jones, "I'm going to shoot you in the face." Montalvo testified that as he continued walking, he heard shots behind him, but did not see the shooting.  He heard people yelling that Jones had shot Griffin. **4**

Several witnesses testified to Griffin's character for violence.  Montalvo had heard of prior incidents in which Griffin had beat up Jones and others.  He had seen Griffin with guns and believed that Griffin's own family was somewhat afraid of him.  Ramont Johnson testified that Griffin won most of the fights he was in.  He said that Griffin would fight "with whoever" and sometimes apologized afterwards.  Gibson had never seen Griffin use a weapon in any of his fights, but acknowledged that Griffin had convictions for possession of a gun and had been released from prison a short time before he was shot.  According to Gibson, physical fights occurred among all members of his family, but when they fought, they reconciled afterwards.

Griffin had an extensive criminal history that included assaults, robberies, drugs, and gun possession.  Jason Anderson, a police officer, testified about an incident in which Griffin assaulted his own uncle and took the uncle's Cadillac.

At trial, the defense called no witnesses.  In closing argument, defense counsel conceded that Jones shot Griffin, but argued that the jury should convict Jones of voluntary manslaughter instead of murder based on a theory of imperfect self-defense.

---

**4**  When he was interviewed by the police, Montalvo said that after Griffin threatened Jones, Jones went to his car and retrieved the gun that he used to shoot Griffin. Jones's blue Dodge Neon was parked on Willow Street, two to three feet from where Griffin was found when police responded.

## DISCUSSION

According to Jones, "this in fact was a close case on the issue of imperfect self-defense." To the contrary, Jones's interview with the police amounted to a confession to first-degree murder. There was not a hint in that interview, or from any of the witnesses who testified, that Jones feared *imminent* death or great bodily injury when he shot Griffin. Jones's fears were about what Griffin might do to him or his family at some future time, not about whatever physical danger might immediately result from the fight that Griffin had started with him. This was not a close case and, as we discuss below, Jones does not make a persuasive argument that any of the errors he argues affected the jury's verdict.

### I. *Legal Standard*

"[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) However, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) Nonetheless, giving an irrelevant or inapplicable instruction is generally " ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

If we find that instructional error occurred, we may not reverse the judgment unless we also find that the defendant was prejudiced by the error. (See, e.g., *People v. Lee* (1987) 43 Cal.3d 666, 671.) If the error rises to constitutional dimension, amounting to a denial of the defendant's due process rights, we determine prejudice using the *Chapman* test: prejudice arises unless the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Otherwise, we determine prejudice using the *Watson* test: prejudice arises if it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

6

"With regard to criminal trials, 'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is " 'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.' " ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 192.) "In reviewing a claim of error in jury instructions in a criminal case, this court must first consider the jury instructions as a whole to determine whether error has been committed. [Citations.] We may not judge a single jury instruction in artificial isolation, but must view it in the context of the charge and the entire trial record." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331; see also *Guiton*, *supra*, 4 Cal.4th at p. 1130 [in examining the question of prejudice from instructional error, an appellate court should look to the entire record, including the evidence and arguments of counsel].)

## II. *CALJIC No. 5.55*

The court instructed the jury with CALJIC No. 5.55: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." The instruction was given at the request of the People without objection by Jones.

Jones contends that the court erred by instructing the jury with CALJIC No. 5.55 because there was no evidentiary support for the instruction. The People disagree, stating: "The evidence at trial established that [Jones] and his cousin Griffin continued an old argument over a Swisher watch before their fight got physical. Appellant walked up to Griffin and asked for the Swisher and that set Griffin off. [Citation.] Thus, while Griffin may have thrown the first punch, [Jones] said the magic words that he knew would set his cousin off." In support of this interpretation of the evidence, the People cite Jones's interview with the police.

The police asked Jones what the fight between him and Griffin was about. Jones replied, "Over his present" and then said, "Swisher. Asked me to buy a Swisher." Jones elaborated a short time later: "I just needed to buy a Swisher. This nigger said you got a pocket full a money in yo pocket. I told him [unintelligible] any he was that serious 'cuz.

7

I want to smoke some weed with you niggers a while ago.[5]  You feel me?  This nigger went through all that other shit, telling these bitches and shit, showing off and shit, sockin' me in my face. . . ."  Later in the interview, Jones said:  "So when I walked over there I asked for the Swisher.  And that was the reason for him to pick the argument with me.  Like all nigger you trippin' you got all that money in your pocket and woo-woo.  Then after the shit happened my nigga pulled [me] to the side, like, man, the nigga said he was gonna get on you anyway.  You feel me?  So it was meant.  Cause he gonna try and do something that I wasn't even knowing about.  I was still going to be playing the cool."

Difficult as it is to discern Jones's intended meaning, what we gather from these passages in the interview is that Jones asked Griffin for a "Swisher" and Griffin responded that Jones had money and could buy his own.  Jones believed that Griffin used the request for a "Swisher" as a pretext for fighting with him.  Nothing here indicates that Jones was seeking an argument with Griffin or knew beforehand that requesting a "Swisher" constituted, as the People would have it, "magic words that he knew would set his cousin off."  There was no evidence that Griffin was particularly sensitive to the mention of "Swishers" or that previous altercations between Jones and Griffin involved "Swishers."  Nothing in Jones's interview with the police reasonably supports an inference that Jones started the altercation with Griffin to create a real or apparent necessity of exercising self-defense.  We conclude that Jones is correct and that there was no evidentiary support for instructing the jury with CALJIC No. 5.55.

Because the court erred by instructing the jury with CALJIC No. 5.55, we consider whether that error was prejudicial to Jones.  Jones contends:  "First, the instruction invited the jurors to discount the significance of the *fact* of . . . Griffin's initial aggression as corroborative of the sincerity and good faith of [Jones's] belief in the need for self-defense.  Secondly, the instruction, by its terms, implies fraud and contrivance on the part

---

**5**  The reference to smoking weed supports Jones's interpretation of "Swisher" in his opening brief on appeal as a cigar filled with marijuana.  We find nothing in Jones's interview that supports the People's interpretation of "Swisher" as a watch.

of [Jones], which *directly* negates sincere belief.  In other words, the erroneous instruction invited a direct negation of the one and only legal defense presented by appellant in this case.  Thus, what is otherwise only state-law evidentiary error, becomes in this case federal constitutional error in the denial of a meaningful opportunity to present a defense."

In *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1380 (*Olguin*) (disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3), the facts presented to the jury did not justify the use of CALJIC No. 5.55 and the defendant argued as Jones argues here.  The *Olguin* court wrote:  "Nor are we convinced the instruction had any bearing on the outcome of the trial.  It was part of a packet of a dozen self-defense instructions, some of which were mutually exclusive.  It was obvious to anyone that not all of those instructions could apply to the case, and the jurors were specifically instructed they were to 'Disregard any instruction which applies to facts determined by you not to exist.'  (CALJIC No. 17.31.)  By all appearances, they understood their charge in this regard.  [¶]  [Defendant] suggests the instruction might have kept the jury from evaluating his self-defense claim, but we don't see how.  This very same argument about the same instruction was made—and rejected—in *People v. Crandell* (1988) 46 Cal.3d 833 . . . where the court concluded, 'we are confident the jury was not sidetracked by the correct but irrelevant instruction, which did not figure in the closing arguments, and we conclude that the giving of the instruction was harmless error.  [Citations.]'  [Citation.]  So do we."  (*Olguin*, at pp. 1381-1382, fn. omitted.)

This case presents circumstances no different from *Olguin*.  The jury was instructed with instructions related to self-defense and imperfect self-defense that were not all mutually compatible.**[6]**  The jury was instructed with CALJIC No. 17.31**[7]** and

---

**[6]**  The instructions related to self-defense were CALJIC Nos. 5.12, 5.17, 5.31, 5.50, 5.50.1, 5.51, 5.52, 5.53, and 5.55.

**[7]**  "The purpose of the court's instructions is to provide you with the applicable law so that you may arrive at a just and lawful verdict.  Whether some instructions apply will depend upon what you find to be the facts.  Disregard any instruction which applies

nothing in the record demonstrates that the jury failed to understand that instruction. Jones points to no part of the prosecution's closing argument that argued for application of CALJIC No. 5.55, nor do we find any. We have no reason to come to a different conclusion than did the *Olguin* court.

**III.** *CALJIC No. 5.17*

The court instructed the jury using CALJIC No. 5.17 to explain the concept of imperfect self-defense: "A person who kills another person in the actual but unreasonable belief in the necessity to defend himself against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation, seeing and knowing the same facts, would not have had the same belief. [¶] Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter. [¶] As used in this instruction, an imminent peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer. [¶] It must be immediate and present and not prospective or even in the future. [¶] However, this principle is not available and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created circumstances which legally justified his adversary's use of force, attack or pursuit. [¶] This principle applies equally to a person who kills in purported self-defense or purported defense of another person."

Jones argues that the part of CALJIC No. 5.17 that makes imperfect self-defense unavailable if the defendant "by his unlawful or wrongful conduct created circumstances which legally justified his adversary's use of force" was unsupported by the evidence and "even more than CALJIC No. 5.55 . . . constituted a negation of [Jones's] only legal defense in this case."

The People justify the inclusion of the challenged part of CALJIC No. 5.17 in the same way they justify the use of CALJIC No. 5.55: "the evidence showed that while

to facts determined by you not to exist. Do not conclude that because an instruction has been given I am expressing an opinion as to the facts." (CALJIC No. 17.31.)

10

Griffin may have thrown the first punch, [Jones] said the magic words that he knew would set his cousin off. Thus, an instruction that pertained to the defendant creating the circumstances which justified his adversary's use of force could have applied here." We have already concluded that the evidence does not support the People's argument. Moreover, even if Jones uttered "magic words," knowing that those words would provoke Griffin to react violently, those words would not have legally justified Griffin's use of force.

We conclude that the challenged part of CALJIC No. 5.17 was not supported by the evidence. However, for the same reasons that we found instruction with CALJIC No. 5.55 to be harmless, we also find harmless the challenged part of CALJIC No. 5.17. We have no reason to believe that the jury, with no evidence of conduct by Jones that legally justified Griffin's attack on Jones, would have employed the challenged clause of CALJIC No. 5.17 in reaching its verdict.

**IV.** *Order of Self-Defense Instructions*

The court instructed the jury about self-defense with CALJIC No. 5.12. The court then instructed the jury about imperfect self-defense with CALJIC No. 5.17. Following the instruction concerning imperfect self-defense, the court instructed the jury with CALJIC Nos. 5.31, 5.50, 5.50.1, and 5.51, which Jones characterizes as placing "objective limitations" on the right to self-defense.[8]

---

[8] CALJIC No. 5.31 states that an assault with fists does not justify response using a deadly weapon absent an actual and reasonable belief that the assault with fists was likely to inflict great bodily injury.

CALJIC No. 5.50 states that one need not retreat from an attack, may defend oneself with the force that would appear necessary to a reasonable person, and may pursue the assailant, as reasonably appears necessary, until secure from danger.

CALJIC No. 5.50.1 states that if the jury believes evidence that the alleged victim previously assaulted or threatened the defendant, then the jury may consider that evidence on the issue of whether defendant actually and reasonably believed that his life or physical safety was endangered at the time of the charged offense. It also states that such prior assaults or threats justify one in acting more quickly and taking harsher measures for self protection.

11

Jones contends that the court should have placed CALJIC Nos. 5.31, 5.50, 5.50.1, and 5.51 between the self-defense instruction (CALJIC No. 5.12) and the imperfect self-defense instruction (CALJIC No. 5.17). If the court had done so, Jones argues, "it would have been clear that they represented factual scenarios in regard to which a[n] unreasonable mistake of fact would mitigate in the context of imperfect self-defense, but for which an unreasonable mistake of law would not." Jones contends that "when placed after CALJIC No. 5.17, there was a substantial likelihood that the jurors [would] interpret these instruction[s] as formulating objective limitations on the availability of imperfect self-defense."

The "general rule is that the order in which instructions are given is immaterial and is left to the sound discretion of the trial court." (*People v. Visciotti* (1992) 2 Cal.4th 1, 61.) The court instructed the jury with CALJIC No. 1.01: "If any rule, direction or idea has been repeated or stated in different ways in these instructions, no emphasis is intended, and you must not draw any inference because of its repetition. Do not single out any particular sentence or any individual point or instruction and ignore the others. Consider the instructions as a whole and each in light of all the others. [¶] The order in which the instructions have been given [have] no significance as to their relative importance." We presume that jurors understand and follow the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) Here, nothing in the record argues against application of this presumption and Jones's argument that the jurors may have read the instructions in an unintended way because of their order is speculation.

"[A] very strong showing of prejudice must be made before a reviewing court will hold [the discretion exercised by a trial court in ordering instructions] abused." (*People v. Carrasco* (1981) 118 Cal.App.3d 936, 942.) Jones's speculation about how jurors might have misinterpreted the law based on the order of instructions does not present a strong showing of prejudice.

---

CALJIC No. 5.51 states that actual danger is not necessary to justify self-defense, so long as a reasonable person would perceive danger under the circumstances.

12

In any case, Jones's speculation does not withstand scrutiny. The essence of his argument is that the ordering of instructions introduced an ambiguity. When presented with a claim of instructional ambiguity, "we review the challenged language to inquire whether there is a reasonable likelihood that the instruction caused the jury to misconstrue or misapply the law." (*People v. Thornton* (2007) 41 Cal.4th 391, 436.) Each of the instructions that Jones believes were ordered incorrectly involves what a *reasonable* person would do or believe under the circumstances. However, CALJIC No. 5.17 is quite clear that it applies when there is an actual but *unreasonable* belief in the need to defend against imminent harm, and we discern no likelihood that the jury misapplied the law, whatever the ordering of instructions.

## V. *Jones's Possession of a Handgun When Arrested and CALJIC No. 2.50*

Jones contends that details about his arrest in Richmond, California, during which he was found to be in possession of a handgun, were improperly admitted under section 1101, subdivision (b), and that this evidence, through the limiting instruction given in accord with CALJIC No. 2.50, prejudicially undermined his defense of imperfect self-defense.

Section 1101 provides, in relevant part: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

The court instructed the jury with CALJIC No. 2.50, a limiting instruction designed to ensure that the jury does not use section 1101, subdivision (b), evidence for

13

an improper purpose, as follows: "Evidence has been introduced for the purpose of showing that the defendant committed a crime other than the one for which he is on trial. [¶] Except as you will otherwise be instructed, this evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show, the following: [¶] A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent, which is a necessary element of the crime charged, or the identity of the person who committed the crime, if any, of which the defendant is accused, or a clear connection between the other offense and the one of which the defendant is accused so that it may be inferred that if the defendant committed the other crime or offenses, he also committed the crimes charged in this case; [¶] The existence of the intent, which is a necessary element of the crime charged; [¶] The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all of the other evidence in this case. [¶] You are not [permitted] to consider such evidence for any other purpose."

Even if evidence that Jones had been arrested with a handgun were not admissible for any purpose[9] and it was error for the court to instruct the jury with CALJIC No. 2.50,

_____

[9] We note, and Jones acknowledges, that the fact that Jones was arrested in possession of a handgun was independently admissible under section 1103, subdivision (b): "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)." Because Jones's counsel cross-examined witnesses to adduce Griffin's violent character, starting with the second prosecution witness, evidence that Jones had been arrested in possession of a handgun was admissible to demonstrate Jones's violent character.

14

we fail to discern any possibility of prejudice. Jones ultimately admitted to police that he shot Griffin multiple times. The jury was informed that Jones had a prior conviction for possession of an assault weapon. The jury heard Jones boast to police about his street reputation that involved gun possession. The fact that Jones was arrested with a handgun was merely cumulative to overwhelming evidence that Jones was frequently in possession of firearms.

Jones argues that CALJIC No. 2.50 focused the jurors "on the inference that if [Jones] had violent disposition as evidence[d] by his penchant for firearms, then one could infer that he committed murder and did not act in imperfect self-defense." Jones overlooks the inconvenient fact that his interview with police was overwhelming evidence that he did not act in imperfect self-defense and we have no reason to believe, on this record and under any standard of prejudice, that the jury would have reached any different verdict without evidence of gun possession by Jones when arrested in Richmond and without instruction with CALJIC No. 2.50.

Jones also does not seem to fully appreciate that because evidence of his character for violence was admissible, as we have already noted, under section 1103, subdivision (b), the jury was entitled to conclude that Jones acted in conformity with his character for violence rather than for some other reason—exactly the inference to which he objects. CALJIC No. 2.50, because it told the jury that "other crime" evidence could not be used as character evidence, was actually beneficial to Jones.

## VI. *Cumulative Error*

Jones argues that if individual errors in this case were not sufficiently prejudicial to require reversal, then the cumulative prejudice presented by the errors requires reversal. We disagree. On the record before us, and considering the content of Jones's interview with the police, the errors that occurred were harmless, both individually and considered together.

15

## DISPOSITION

The judgment is affirmed.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Haerle, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16