Filed 7/31/18

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br>Plaintiff and Respondent,<br>v.<br>RUSSELL DUSTY FLEMING,<br>Defendant and Appellant. | F072914<br>(Super. Ct. No. F14911174)<br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Arlan L. Harrell, Judge.

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Kelly E. LeBel, and Jamie Scheideggar, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

## INTRODUCTION

When an invited guest, knowing his friend is asleep in the living room, gets into a bed where his friend's wife is asleep and digitally penetrates her vagina without her knowing consent but without her initial objection or resistance, has he committed sexual penetration by artifice, pretense, or concealment in violation of Penal Code section 289, subdivision (f)? After a jury trial, the jury concluded the answer is "yes" and convicted defendant Russell Dusty Fleming of one count of sexual penetration by fraud (Pen. Code, § 289, subd. (f); unless otherwise specified, all statutory references are to the Pen. Code.) On December 15, 2015, the trial court sentenced defendant to the mitigated term of three years in prison.

Defendant contends on appeal he did not violate section 289, subdivision (f) because there was no substantial evidence his conduct included actions qualifying as pretense, artifice, or concealment. Defendant argues CALCRIM No. 1051, the pattern jury instruction setting forth the elements of the offense, failed to set forth the element that the jury must find a causal link between defendant's actions and the victim's belief. Defendant contends the court prejudiced him by removing a juror based on a finding of bias by the juror unsupported by the evidence. In the published portion of this opinion, we reject the first contention, and in the unpublished portion, we reject the latter contentions and affirm the judgment.

## FACTS

### *Prosecution Case*

The evening of December 12, 2014, defendant went out with friends for dinner and dancing to celebrate Taryn W.'s birthday. The party included Cheyenne, Blake and his wife D.P., and neighbors Megan and Mitchell. Cheyenne left after dinner because she was not old enough to drink alcohol. D.P. said they all drank enough that evening that they should not be driving, and she herself was intoxicated. But D.P. was not suffering from a hangover the next morning and had last consumed alcohol eight hours earlier.

About 12:30 a.m., the group took a taxi back to the home of Blake and D.P. Taryn W. went to sleep in Cheyenne's bedroom. Defendant was carried into an unoccupied bedroom by Megan and Mitchell, who shut the door. Megan and Mitchell left and went home. Blake, D.P., and Cheyenne watched a movie in the family room. All three fell asleep on the couch.

About 7:00 a.m. the next morning, defendant entered the family room to retrieve his cell phone from underneath the sofa and called his employer to say he was not coming to work. D.P. was awakened by defendant, got up from the sofa, and went into her bedroom and shut the door. D.P. changed into a tank top and pajamas before climbing into bed around 7:30 a.m. She was alone in her room. D.P. slept facing the wall and bedroom closet.

Sometime before 9:15 a.m., defendant went into D.P.'s room without her noticing. D.P. was sleeping. Defendant climbed into Blake's side of the bed and lay down behind D.P. underneath the covers. D.P. felt a body against her and thought it was her husband. D.P. could not see the person behind her. Defendant did not say anything. Defendant groped D.P., putting his fingers inside her vagina. D.P. thought her husband was with her in bed and "started getting into it."

D.P.'s cell phone rang. D.P. explained: "So I woke up to—because my phone rang and I realized that somebody was in bed with me and he was touching me, and I thought it was my husband Blake." As D.P. turned over and reached across Blake's side of the bed to retrieve her phone from the dresser, defendant pulled the covers over his head. D.P. pulled the covers back and saw defendant. She screamed. D.P. was shocked and deeply disturbed. Defendant had been friends with her husband for a long time and was in their wedding.

Defendant and D.P. never had a sexual relationship. D.P. did not consent to defendant's conduct. D.P. did not give defendant permission to touch her and felt violated. D.P. ran out to the living room and woke her husband. Blake confronted

defendant in the master bedroom, ordering defendant to get out of his bed. Defendant pretended he did not know what was happening. Defendant was not wearing a shirt and his belt was on the floor. Blake told defendant to leave.

D.P. was very upset and cried. Blake could not comfort her. D.P. did not sleep in her bed for a month; she reported the incident to the police on Monday, two days after the incident.

Cheyenne testified she helped put Taryn to bed in Cheyenne's bedroom. She remembered defendant coming to the couch in the living room on Saturday morning to get his cell phone. Defendant said he had to call work. Cheyenne got up about 15 minutes later to go to her bedroom. When she looked in the room, she saw defendant lying next to Taryn, who was asleep. Defendant was wearing jeans with no shirt. When defendant saw Cheyenne, he patted the bed and said there was room for three. Cheyenne refused and ordered him out. Defendant finally got out of the bed and Cheyenne crawled into it. Defendant stayed in the bedroom, walking around for a little while.

Defendant briefly left, but after a few minutes he crawled back into the bedroom on his hands and knees. Defendant looked up at Taryn from the floor and said, '"You look beautiful when you're sleeping.'" Cheyenne again told defendant to get out. Before leaving the room, defendant said, "'You are evicting me from your room?'" Sometime after defendant left the bedroom the second time, Cheyenne heard D.P. yelling and hysterical. D.P. was accusing defendant of touching her. Defendant also became hysterical and said nothing had happened.

***Defense***

Deputy Rudolfo Tafoya of the Fresno County Sheriff's Department prepared a report from D.P.'s description of the incident on December 15, 2014. D.P. reported the crime as a rape. On direct examination D.P. testified she had asked, "Blake, what are you doing?" after the incident. D.P. told Deputy Tafoya she had said, "[Defendant], what are you doing here?" When D.P. met with the investigator at the district attorney's office on

February 24, 2015, she made no reference to asking, “Blake, what are you doing?” Since D.P. had already washed her night clothes and the bed sheets before the officer came to her home, there was no physical evidence for him to collect.

## DISCUSSION

### I. Evidence of Artifice, Pretense, or Concealment

***Introduction***

Defendant contends his conviction must be reversed because there was no evidence he committed pretense, artifice, or concealment when he touched D.P., an element of section 289, subdivision (f). Section 289, subdivision (f) has the following elements: (1) the defendant committed an act of sexual penetration with another person; (2) the penetration was accomplished using a foreign object; (3) the other person submitted to the act because she believed the person committing the act was someone she knew other than the defendant; and (4) the defendant tricked, lied, used an artifice or pretense, or concealed information, intending to make the other person believe that he was someone she knew, while intending to hide his own identity. (§ 289, subd. (f); CALCRIM No. 1051.)

An earlier version of the statute and the jury instruction included the element that at the time of the sexual penetration, the alleged victim submitted to the act under the belief the defendant was the victim’s spouse. Beginning on September 9, 2013, section 289, subdivision (f) was amended to eliminate this element. (Stats. 2013, ch. 282, § 2, eff. Sept. 9, 2013.) The act in question here occurred more than a year later in December 2014, but the trial court included in the jury instructions the element that the defendant not be the spouse of the victim.

Defendant asserts the only prior opinion on point, *People v. Leal* (2009) 180 Cal.App.4th 782 (*Leal*), is inapposite because it involved a different factual scenario and misinterpreted subdivision (f) of section 289. We reject defendant’s argument.

***Substantial Evidence***

When a defendant challenges the sufficiency of the evidence, appellate courts must review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. This standard of appellate review is the same in cases in which the People primarily rely on circumstantial evidence. Although a jury must acquit if it finds the evidence susceptible of a reasonable interpretation favoring innocence, it is the jury and not the reviewing court that weighs the evidence, resolves conflicting inferences, and determines whether the People have met the burden of establishing guilt beyond a reasonable doubt. If the trier of fact's findings are reasonably justified under the circumstances, the opinion of the reviewing court that the circumstances may also be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Casares* (2016) 62 Cal.4th 808, 823–824.) After reviewing the evidence in the light most favorable to the prosecution, we determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212–1213.)

Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.) An appellate court must accept the logical inferences the jury might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear that there was no hypothesis whatever upon which there was substantial evidence to support the verdict. (*People v. Conners* (2008) 168 Cal.App.4th 443, 453; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

***Analysis***

In *Leal*, husband A. and wife T.C. celebrated her birthday in their duplex. Over the course of the evening, both drank large amounts of alcohol and became highly intoxicated. T.C. changed into her pajamas about 1:00 a.m. and went to sleep in their bedroom. She was joined by A. a few minutes later in their queen-sized bed. During that night, T.C. felt her vagina being penetrated by a penis as she was lifted up and placed on the edge of the bed. (*Leal*, *supra*, 180 Cal.App.4th at p. 785.) Although T.C. believed she was having sex with her husband, they had not had sex in that manner before, and in fact it was the defendant, who was a stranger and had entered the duplex through a window. (*Leal*, at pp. 785–786.)

T.C. did not feel hair on the back of the stranger, though A. had hair on his back, and she felt facial hair on the stranger, though A. had no facial hair. A. also usually woke her up and asked her if she wanted sex. Because T.C. was so intoxicated, she was unable to fully process the significance of these differences. When the encounter was over, T.C. lay back on her pillow and saw what appeared to be the silhouette of someone leaving the room. She reached across the bed and found A. lying there. T.C. said she thought someone was there, but A. did not respond. T.C. was taken to a hospital and examined and a rape kit was prepared. Three years later the DNA profile made from the kit matched defendant's DNA. (*Leal*, *supra*, 180 Cal.App.4th at p. 786.)

Leal was convicted of rape and sexual penetration by artifice, pretense, or concealment (§§ 261, subd. (a)(5), 289, subd. (f)), as well as assault with intent to commit rape (§ 220, subd. (a)). (*Leal*, *supra*, 180 Cal.App.4th at p. 785.)

*Leal* noted California was one of only a handful of states with current laws defining rape to include acts of sexual intercourse in which the victim's apparent consent is induced by the belief the person performing the act is her spouse. (*Leal*, *supra*, 180 Cal.App.4th at p. 788.) As already noted, the element of personating a spouse is no longer an element of section 289, subdivision (f). False personation of someone else to

induce a person into a sexual act, however, is still an element of the offense, so cases discussing personating a spouse remain relevant analogies.

The court in *Leal* noted the only published case in California involving false personation of a spouse was a 1922 appellate court decision where the defendant obtained consent to intercourse after a feigned marriage. (*Leal*, *supra*, 180 Cal.App.4th at p. 788, citing *People v. McCoy* (1922) 58 Cal.App. 534.) *Leal* turned to a case from North Carolina and one from Arizona. North Carolina had a statute "'prohibiting carnal knowledge of a married woman by fraud in personating her husband.'" (*Leal, supra*, at p. 788, citing *State v. Williams* (1901) 128 N.C. 573 [37 S.E. 952, 953] (*Williams*).)

The wife in *Williams* was visiting her ill mother but was expecting her husband to join her that evening. During the night, the defendant lay down next to the sleeping wife, squeezed her hand, and pulled her towards him. When the wife asked who was there, the defendant said nothing initially. Thinking it was her husband, the wife asked when he had arrived. In a whisper, the defendant replied he arrived a little while ago. His voice was so low the wife did not suspect the defendant was not her husband and sexual intercourse followed. The court in *Williams* found sufficient evidence to sustain the defendant's conviction, reasoning the defendant knew he was not the woman's husband and he also knew the wife thought the defendant was her husband. The *Williams* court reasoned the defendant acted to "keep up the delusion until he accomplished his purpose." *Williams* found that even if the defendant lay down on the pallet by mistake, once he found the woman there and pulled her hand to solicit her to consent to intercourse, the defendant knew he was obtaining intercourse by fraud in personating the wife's husband. (*Williams*, *supra*, 128 N.C. at p. 575 [37 S.E. at p. 953]; see *Leal*, *supra*, 180 Cal.App.4th at p. 788.)

Arizona had a statute similar to the North Carolina statute. In *State v. Navarro* (1961) 90 Ariz. 185 [367 P.2d 227] (*Navarro*), the victim went to sleep in the bedroom she shared with her husband while he and four other men, including the defendant, drank

beer and watched television in another room. The victim remembered waking up in the middle of the night with defendant on top of her trying to have sexual intercourse. Believing the defendant to be her husband, the wife submitted to him. In a matter of seconds she became aware he was not her husband and cried out asking who he was. The defendant covered her mouth with his hand and told her not to scream. When she cried and resisted, the defendant escaped from the house, leaving clothes behind. (*Navarro*, *supra*, at p. 187 [367 P.2d at p. 228]; *Leal*, *supra*, 180 Cal.App.4th at p. 789.) The *Navarro* court found the victim's testimony was sufficient to establish both corpus delicti and conviction. (*Navarro*, *supra*, at p. 189 [367 P.2d at p. 230]; *Leal*, *supra*, at p. 789.)

The *Leal* court used the following definitions for artifice, pretense, and concealment:

> "Artifice is defined as '[a] clever plan or idea, [especially] one intended to deceive.' (Black's Law Dict. (8th ed. 2004) p. 120, col. 2.) Pretense in this context is commonly understood to connote an act of pretending (Roget's II: The New Thesaurus (3d ed. 1995) p. 763), while concealment can refer to either an 'act of refraining from disclosure' or hiding to prevent discovery (Black's Law Dict., *supra*, at p. 306, col. 2)." (*Leal*, *supra*, 180 Cal.App.4th at p. 789.)

The court in *Leal* found the jury could reasonably infer the defendant employed deceptive methods when he quietly entered T.C.'s dark bedroom in the middle of the night, began to masturbate her as she was sleeping next to her husband, and engaged in sexual intercourse with her. *Leal* reasoned the jury could also reasonably conclude a woman in T.C.'s situation would reasonably believe these acts were being committed by her husband. (*Leal*, *supra*, 180 Cal.App.4th at p. 789.) *Leal* concluded that viewed in the light most favorable to the judgment, the evidence supported the jury's finding the defendant intended to induce T.C. to believe he was her husband, and for that reason she submitted to his sexual advances. (*Leal*, *supra*, at p. 790.)

Defendant argues the facts of *Leal* are distinguishable from the instant action. He further argues the holding in *Leal* improperly relies on the concept of passive

concealment as used in civil tort law. Defendant contends section 289, subdivision (f) requires more than quiet passivity, but affirmative action by a defendant actively practicing actual artifice, pretense, or concealment. We disagree with defendant's constricted interpretation of these terms. Instead, we agree with the *Leal* court that, depending on the circumstances, passive concealment is fraud by misrepresentation where there is a duty to disclose. (*Leal*, *supra*, 180 Cal.App.4th at p. 790.) In any event, as we explain in greater detail, defendant's conduct was not passive concealment but a deliberately considered plan involving active concealment of his identity from D.P.

We also disagree with defendant's assertion the facts of this case are substantially different from those in *Leal*. D.P.'s husband was asleep on a couch and not in the bedroom he usually shared with D.P. As in *Leal*, defendant quietly entered that bedroom and stealthily entered the bed without waking D.P. while D.P. slept facing the wall away from him. Concealing his identity by not waking D.P. or making his presence known, he began to digitally penetrate D.P. while remaining behind her, outside of D.P.'s sight and while she was still asleep. These facts are nearly identical to those in *Leal*. As with the husband in *Leal*, Blake was soundly sleeping after an evening of heavy drinking. Defendant had the opportunity to observe how deeply Blake was sleeping when he retrieved his cell phone from the couch. The fact Blake was nearby but not in the bed he shared with D.P. leads to the reasonable inference that D.P. would believe the person in her bed committing a sexual act on her, whom she could not see, was her husband and not defendant.

The facts of this case are arguably stronger than those in *Leal* because the defendant there did not have hair on his back like the victim's husband and he also had facial hair, which the victim's husband lacked. The facts in this case are also very similar to those in *Navarro* where the defendant stealthily entered the victim's room while she was still asleep and engaged her in sexual intercourse when the victim's husband was not in the room but in the living room drinking alcohol.

The facts here differ from those in *Williams* in two relevant ways. First, the victim in *Williams* woke up and talked to the defendant, asking when he had arrived. Second, Williams responded to the victim in a low whisper so she could not detect whether the voice was her husband's. Arguably the concealment in *Williams* was more active than what occurred in *Navarro*, *Leal*, and the instant action. In each of the published authorities as well as here, however, there was intentional concealment by a defendant attempting to hide his identity from the victim, personating another to effectuate a sexual act with the victim.

Defendant's observations of an unconscious husband separated from his unconscious wife—albeit by a short distance—and his stealth in entering D.P.'s bedroom and her bed, show a clever plan intended to deceive. Prior to this incident, defendant was also found next to Taryn in the bed she was sleeping in. Defendant was alert enough to find his phone, call his boss, and to observe the sleeping state of everyone in the house. This is all evidence from which the jury could reasonably find artifice: a clever plan intended to deceive. Slipping into D.P.'s bedroom and bed while she was asleep with her back turned to defendant was an act of pretending from which the jury could reasonably infer pretense under the circumstances.

From the totality of the circumstances, the jury could further infer concealment, which includes both an act of refraining from disclosure and hiding to prevent discovery. Defendant's conduct undeniably involved multiple acts to refrain from disclosing his identity to D.P. When the phone rang and D.P. reached over to answer it, defendant's act of covering himself with a bedsheet involved hiding himself to prevent discovery. We reject defendant's argument that covering himself was incidental to the sexual act because he was still sexually engaging D.P. when the phone rang. Even if defendant had finished the sexual act, by covering himself, he continued his artifice, pretense, and concealment. If we were to conclude the act of defendant covering himself was incidental to the sexual conduct, this concealment demonstrates defendant engaged D.P.

without her knowledge that it was defendant and without giving him consent or permission to do so. It was also indicative of defendant's state of mind throughout the incident, as well as his ability to form a plan to conceal himself.

There was substantial evidence before the jury from which it could reasonably find defendant penetrated D.P. by means of artifice, pretense, and concealment. The prosecution established this element of the offense, as well as the other elements of the offense, beyond a reasonable doubt. There was, therefore, no violation of defendant's right to due process. (See *In re Winship* (1970) 397 U.S. 358, 364.)

## II. CALCRIM No. 1051 Instruction[*]

### *Introduction*

Defendant contends CALCRIM No. 1051, the pattern jury instruction for an allegation of section 289, subdivision (f), failed to apprise the jury of the elements of the offense because it omitted the necessary finding defendant caused the victim's false belief that another person was penetrating her vagina with his fingers. Defendant argues the instruction failed to explain to the jury it had to find a causal link between defendant's actions and the victim's belief. The People reply defendant failed to object to the instruction and has therefore forfeited appellate review. The People further argue the instruction adequately informed jurors there was no offense unless defendant induced D.P.'s false belief that he was her husband, thereby requiring a causal link between defendant's actions and the victim's belief. We find no instructional error.

### *Forfeiture*

A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. (*People v. Hart* (1999) 20 Cal.4th 546, 622.) Thus, the People are correct in asserting a claim of instructional error is not

---

[*] See footnote, *ante*, page 1.

cognizable on appeal if the instruction is correct in law and the defendant fails to request a clarifying instruction. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1236 [claims of clarity and completeness of instructions forfeited without request for clarification].) If, however, the asserted error consists of a failure to instruct on an essential element of the offense, the failure to lodge an objection does not preclude appellate review of the issue. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1138, overruled in part on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Because defendant's assertion of error is based not on a claim the instruction was unclear or needed amplification but omitted an element of the offense, we review the merits.

***Analysis***

Trial courts have a sua sponte duty to instruct the jury on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Anderson* (2011) 51 Cal.4th 989, 996; *People v. Martinez* (2010) 47 Cal.4th 911, 953.) The trial court's sua sponte duty to instruct includes instructions on all the elements of the offense. (*People v. Merritt* (2017) 2 Cal.5th 819, 824; *People v. Mil* (2012) 53 Cal.4th 400, 409; *People v. Magee* (2003) 107 Cal.App.4th 188, 193.)

In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. We do not consider parts of an instruction. (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) They are judged from the entire charge of the court and the entire trial record. (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331.)

The jury was instructed with the following relevant paragraphs of CALCRIM No. 1051:

> "The other person submitted to the act because she believed the person committing the act was someone she knew other than the defendant;
>
> "AND

> "… The defendant tricked, lied, used an artifice or pretense, or concealed information, intending to make the other person believe that he was someone she knew, while intending to hide his own identity."

Defendant argues the instruction failed to establish a causal link between the victim's belief that defendant was her husband and defendant's actions. The first part of the instruction, however, requires the jury to find the victim submitted to the sexual act because she believed the person committing the act was someone she knew other than defendant. The second part of the instruction required the jury to find defendant tricked, lied, used artifice, pretense, or concealed information with the intent to make the victim believe he was someone she knew while intending to hide his own identity. There is no missing element in the trial court's instructions to the jury. To find defendant guilty, the jury had to find a causal connection between the victim's erroneous belief as being caused by defendant's conduct.

The instruction required findings from the jury that the victim's belief was due to the artifice, pretense, or concealment of information by defendant. Because the instruction required both findings, it established the causal link between the victim's belief and defendant's conduct leading to that false belief. Other instructions required the jury to presume defendant innocent and find the allegations true beyond a reasonable doubt (CALCRIM No. 220), the People to prove both the act charged as well as defendant's intent (CALCRIM No. 225), and the jury to find defendant had the specific intent to commit the crime of sexual penetration by fraud (CALCRIM No. 251). Read as a whole, the jury instructions adequately informed the jury of its duty to find each necessary element of section 289, subdivision (f).

The instruction did not expressly use the phrase "causal connection" in describing what the jury had to find. The finding of a causal connection is covered by the requirement that both elements be found true by the jury and is implicit in CALCRIM No. 1051. Although the instruction could have been clarified, the failure of the trial court to do so did not deprive defendant of instructions correct in law and required each

element of the offense be found true by the jury. The instructions were not impermissibly ambiguous to the extent the trial court failed to fulfill its sua sponte duty to offer its own clarifying instructions. (See *People v. Hart*, *supra*, 20 Cal.4th at p. 622.) There was no instructional error in the trial court's use of CALCRIM No. 1051.

## III. Discharge of Juror No. 26[*]

Defendant contends the trial court abused its discretion in discharging Juror No. 26 for failing to disclose his prior close relationship with Deputy Tafoya. The discharge occurred prior to jury deliberations. We reject this contention.

### ***Discharged Juror***

Here, the trial court properly inquired into Juror No. 26's friendship with defense witness Rudolfo Tafoya before discharging him from the jury. During voir dire, prospective jurors had been asked to raise their hand if any relatives or close friends had law enforcement training and whether any relatives or close friends had been arrested by law enforcement. Five jurors responded affirmatively and were questioned about their relationships by the court. Juror No. 26 was silent about having any connection to law enforcement. Juror No. 26 did indicate he had a few family members who were arrested for drunk driving and he thought a few of the cases were not handled well by the Fresno Police Department. Only after Tafoya testified did the juror contact the bailiff and notify him he recognized the witness.

Outside the presence of the jury, Juror No. 26 notified the court and counsel he had been friends with Tafoya during college, starting in 2008 and 2009 through graduation in 2012. Juror No. 26 socialized with Tafoya and they went to parties together. They socialized together at a friend's house and had barbeques during the summer. Juror No. 26 and Tafoya had seen each other less frequently during the past

---

[*] See footnote, *ante*, page 1.

three years since they graduated. Occasionally their paths would cross, and they would catch up with one another.

Juror No. 26 admitted he did not indicate during voir dire he had a friend or relative in law enforcement. Juror No. 26 said he knew Tafoya by Rudy, not his given first name of Rudolfo. He admitted he always knew Tafoya was in law enforcement. Juror No. 26 was aware of Tafoya's workouts and the physical training. The court directed Juror No. 26 to go back to the jury room and to not talk to the other jurors about what they had discussed.

The court informed counsel it was entertaining substituting Juror No. 26 based on his failure to notify the court of his friendship with Tafoya. The court noted Juror No. 26 was well aware Tafoya was going through law enforcement training. The court was skeptical the juror would not have recognized the deputy's last name even if the juror had not recognized the deputy's first name. The court noted its concern about the closeness of the relationship given their socializing on weekends and the inability of both attorneys to question the juror about his relationship with the deputy. The court could not see how the juror would be able to question his friend's credibility. The prosecutor thought it would be preferable to err on the side of caution and excuse Juror No. 26. Defense counsel had nothing to add. The court found the omission intentional—especially given the juror's intelligence and comment he had a photographic memory—and excused Juror No. 26.

***Analysis***

Trial courts have a duty to make whatever inquiry is reasonably necessary to ascertain whether a juror should be discharged once the court is placed on notice good cause to discharge the juror may exist. On appeal, we review the trial court's decision to discharge a juror under an abuse of discretion standard, upholding the court's decision if the record supports the juror's disqualification as a demonstrable reality. Under the demonstrable reality test, the record must show the trial court, as trier of fact, relied on

evidence supporting its conclusion the juror's disqualification was established. In determining whether the trial court's conclusion is supported by the evidence on which the court relied, we consider both the evidence itself and the record of reasons provided by the court. We do not reweigh the evidence. (*People v. Williams* (2013) 58 Cal.4th 197, 292.)

Trial courts are frequently confronted with conflicting evidence on the question of whether a deliberating juror has exhibited bias. Often, the challenged juror will deny bias and other jurors will testify to examples of how he or she revealed it. The trial court must then weigh the credibility of those testifying and draw upon its own observation of the jurors throughout the proceedings. Reviewing courts defer to factual determinations based on these assessments. (*People v. Lomax* (2010) 49 Cal.4th 530, 590.)

Nondisclosure or misrepresentation of material information by a juror during voir dire constitutes juror misconduct. (*In re Hitchings* (1993) 6 Cal.4th 97, 120–123.)

Juror No. 26 had an ongoing relationship with Deputy Tafoya while they attended college together. The trial court found implausible Juror No. 26's explanation that during voir dire he did not recognize Tafoya's name because Tafoya used the name Rudy in college rather than his given name of Rudolfo. Explaining its observations of Juror No. 26 during voir dire, the trial court noted the juror had a good memory. Based on this observation, the trial court further found implausible Juror No. 26's failure to remember his relationship with Tafoya in college.

The trial court's conclusions regarding Juror No. 26's prior relationship with Tafoya are manifestly supported by the evidence. The trial court's findings are supported by Juror No. 26's testimony. Juror No. 26 had graduated from college in 2012, only three years prior to the trial, and he had occasionally seen Tafoya in public places after graduation. This evidence also supported the court's conclusion that Juror No. 26's explanation of a lapse of memory should be discredited. Further, the lack of objection by

the prosecutor and defense attorney to the trial court's observations and findings support the conclusion the trial court did not abuse its discretion in dismissing Juror No. 26.

**DISPOSITION**

The judgment is affirmed.

PEÑA, J.

WE CONCUR:

FRANSON, Acting P.J.

SMITH, J.