Filed 8/22/23  P. v. Crowell-Ford CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTIAN CROWELL-FORD,<br><br>    Defendant and Appellant. | D080078<br><br><br><br>(Super. Ct. No. FSB18001506) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge.  Affirmed

Gene D. Vorobyov, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Marvin E. Mizell, and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Christian Crowell-Ford of first degree murder and found true various firearms enhancements. (Pen. Code,[1] §§ 187, subd. (a); 12022.53, subds. (b)-(d).) During his jury trial, evidence was presented that an eyewitness identified Crowell-Ford as the perpetrator of the murder. The trial court instructed the jury to consider several factors when assessing the eyewitness identification testimony, including the "certainty factor" provided in CALCRIM No. 315. The certainty factor asked the jury to evaluate "how certain was the witness when he or she made an identification."

In *People v. Lemcke* (2021) 11 Cal.5th 644, 647 (*Lemcke*) our high court directed trial courts to omit the certainty factor from CALCRIM No. 315 until the instruction was modified to avoid "juror confusion regarding the correlation between [eyewitness identification] certainty and accuracy." Crowell-Ford's sole contention on appeal is that the trial court erroneously included the unmodified certainty factor in CALCRIM No. 315 and in so doing violated his constitutional rights. He argues that he was prejudiced by the trial court's instructional error and asks this court to reverse his conviction and remand the matter for a new trial. We conclude the instruction did not violate Crowell-Ford's constitutional rights when viewed within the context of the jury instructions and trial record as a whole. We further conclude that the purported instructional error was harmless, and we therefore affirm the judgment.

---

[1] All undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Evidence at Trial*

On the afternoon of April 13, 2018, Crowell-Ford visited his girlfriend, D.C., at her grandparents' home. D.C.'s grandparents lived in a mobile home park that was separated from a nearby field and drainage wash by a six feet tall retaining wall. D.C.'s grandparents, uncle, and cousin, were also present in her grandparents' home that afternoon. Crowell-Ford left the mobile home at some point during his visit and did not tell D.C. where he was going.

That same afternoon, P.I. worked on a construction project in a mobile home next to D.C.'s grandparents' residence. The mobile home was elevated around three or four feet, which allowed P.I. to see over the retaining wall and into the nearby field. While he was working on floorboards in the home, P.I. heard a round of gunshots that he initially believed may have been fireworks. He looked through the window and saw two people facing each other in the field. P.I. had never seen the people before and he described them as a "Hispanic" man and a "Black" man. He observed the Hispanic man walking backwards with his hands up.

P.I. resumed his work and a few minutes later heard between eight to ten rapid gunshots. He looked through the window again and no longer saw the Hispanic man standing. He saw the African American man jump over the retaining wall, walk through the mobile home complex, and enter D.C.'s grandparents' home.

P.I. walked to the retaining wall, looked over, and saw the Hispanic man lying in the field. After observing that the man was not moving, he called 911. P.I. told police dispatch, "I seen a guy getting shot I think" and described the suspect as a "Black guy."

3

Another resident of the mobile home park, A.P., also witnessed the two men in the field. At around dusk, A.P. was washing dishes and facing a window that looked toward the retaining wall bordering the mobile home park. He heard popping sounds that he later believed to be gunshots and saw two people—a "Hispanic" man and a "Black" man—facing each other in the field. A.P. observed the African American man walking towards the Hispanic man while "pointing and firing."

After a brief pause, A.P. heard more gunshots and no longer saw the Hispanic man standing. He told police he observed the African American man jump over the retaining wall and walk into the mobile home complex, but he testified that he did not get a good look at his face. A.P. called 911 and told police dispatch that he observed a "Black male shoot at, at some other guy . . . ." He told police the shooter was wearing a black beanie and a black shirt with red letters.

When police officers arrived at the mobile home park, they found Irwin Dominguez deceased in the nearby field. The medical examiner determined Dominguez had been shot 14 times and died within minutes of suffering his injuries. Near his body were 16 expended nine-millimeter cartridge casings and a fired bullet. Officers also found "fresh" shoe impressions one or two feet from Dominguez's body, approximately 15 feet from the retaining wall, and directly next to the retaining wall.

P.I. directed the responding police officers to the mobile home he observed the man from the field enter. Although P.I. did not keep constant observation on the mobile home, he did not see the man exit the home prior to the police's arrival. He described the man as having "dreadlocks" and wearing a black and red t-shirt, black jeans, red shoes, and a black beanie.

4

The police set up a containment perimeter around D.C.'s grandparents' home. D.C.'s grandfather, uncle, and cousin exited the home, and police gave announcements ordering everyone else to exit. Crowell-Ford walked out of the home, followed by D.C. and her grandmother. An officer testified that Crowell-Ford was the only person who exited the home and "fit the description" provided by P.I.

Crowell-Ford was detained by police and P.I. agreed to do an "infield show[-]up." P.I. was concerned about being perceived as a participating witness in the criminal investigation, so he asked an officer to pretend to arrest him before returning to do the show-up. The officer placed P.I. in handcuffs and drove him away from the mobile home complex.

P.I. returned to the mobile home park in the back of the police patrol car. Crowell-Ford stood in front of the patrol car and P.I. said "that's him" or "that's the guy." P.I. was "certain" Crowell-Ford was the same man he saw in the field where Dominguez's body was found. He recognized Crowell-Ford's hair and believed he was possibly wearing the same shirt but had changed pants.

Police officers obtained a search warrant for D.C.'s grandparents' home and searched the residence. The mobile home had three bedrooms: the first bedroom, used by D.C.'s grandparents; a second bedroom, used for storage; and a third bedroom, used by the grandparents' grandchildren, including D.C. In the bedroom used by D.C., officers found a gun and a high capacity magazine wrapped in a t-shirt and hidden in a ventilation grate. A black beanie was also found in the same bedroom.

Crowell-Ford was arrested and transported to the police station. The shoes Crowell-Ford was wearing at the time of his arrest were booked into evidence. A homicide detective compared the shoe impressions found near

Dominguez's body and the nearby retaining wall, with the shoes Crowell-Ford wore during his arrest. The detective opined that the sole pattern of Crowell-Ford's shoes matched the shoeprints.

Crowell-Ford's fingerprints were not found on the gun, magazine, or floor vent under which the gun and magazine were found. The police took DNA swabs from the gun, magazine, floor vent, and beanie, and no evidence was presented that any sample matched Crowell-Ford. Nor did Crowell-Ford test positive for gunshot residue.

A firearms expert opined that the shell casings and bullet found near Dominguez's body had been fired by the gun found in the ventilation grate. D.C.'s uncle asserted that neither he, nor D.C.'s grandparents, stored a gun at the grandparents' residence.

D.C. disclosed to police that when Crowell-Ford returned from his unannounced absence on the afternoon of the shooting, he told her that he had been in the wash area behind the retaining wall but had returned when he heard gunshots. Crowell-Ford was wearing a black shirt when he initially returned but asked D.C. if she could provide him with a different shirt. D.C. gave him a blue shirt and she could not remember what he did with the black shirt that he had previously been wearing. D.C. testified she was not present with Crowell-Ford when he changed clothes or while he was in her bedroom and bathroom.

During the trial, neither P.I. nor A.P. made an in-court identification of Crowell-Ford as the man they observed in the field on the afternoon of Dominguez's murder. However, P.I. testified that he was "certain" the man he identified in the mobile home park—Crowell-Ford—was the same man in the field with Dominguez during the shooting. D.C. also had trouble

6

identifying him in the courtroom because she believed Crowell-Ford "looked different" during the trial.

Following the presentation of the prosecution's evidence, Crowell-Ford moved to dismiss the case based on a "lack of I.D." In response, the prosecution proffered that although P.I. was unable to identify Crowell-Ford in court during the trial, P.I. "testified that the person that he identified as the person that he saw in the field with the victim during the sound of gunshots and with the hands placement as he testified to, he was certain that he identified the right person. We laid the appropriate foundation that [the person P.I. identified] was the defendant Crowell-Ford." The trial court found there was substantial evidence to support a guilty verdict and denied the motion. Crowell-Ford did not present affirmative evidence.

*Jury Instructions*

The trial court provided 40 pages of jury instructions to the jury, which included 29 individual numbered instructions. The instructions included CALCRIM No. 315, which related to eyewitness identification testimony. As given by the trial court, CALCRIM No. 315 provided:

> You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did

7

the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find the defendant not guilty.[2]

The trial court provided additional instructions relating to the credibility of witnesses, including CALCRIM No. 226.  This instruction required the jury to evaluate the credibility and believability of witnesses, including a factor that asked "how well could the witness see, hear, or otherwise perceive the things about which the witness testified."

Crowell-Ford objected to the use of CALCRIM No. 371 (relating to a defendant's attempt to hide evidence) and CALCRIM No. 372 (relating to a defendant's flight) but he did not object to the use of CALCRIM No. 315.

*Closing Arguments*

The prosecution argued the evidence established, beyond a reasonable doubt, that Crowell-Ford committed the premeditated murder of Dominguez. They emphasized P.I.'s certainty during his identification of Crowell-Ford, arguing that P.I. was "certain that the person that he picked out in that infield lineup was the person that was in the field that he saw going toward

---

[2]    CALCRIM No. 315 was modified in March 2022.  The instruction now states, "[a] witness's expression of certainty about an identification, whether the identification was made before or at the trial, may not be a reliable indicator of accuracy."  (CALCRIM No. 315 (rev. March 2022).)  The instruction directs the jury to consider additional factors related to eyewitness certainty, including whether the police used procedures that increased the witness's level of confidence about the identification.  (*Ibid.*)

Mr. Dominguez, hopping over the retaining wall, and going into [D.C.'s grandparents' home]. He was certain." The prosecution later posed the rhetorical question, "how certain was Mr. [P.I.] when he made an identification? I asked him. He said, 'I was certain that the person that I picked out on that day was the person that I saw in the field, jumping over the wall, and going into the house.' He said he was certain, and he picked him out in the infield show-up."

The prosecution also argued that the physical and circumstantial evidence supported a conclusion that Crowell-Ford was the perpetrator of Dominguez's murder. They noted that the gun used to commit the murder was found in Crowell-Ford's girlfriend's room, and that the evidence suggested he was alone in this room for some time. Further, P.I. and A.P. provided independent descriptions of the perpetrator that matched Crowell-Ford's clothing and hairstyle on the night of his arrest. Finally, the prosecution discussed the detective's opinion that the shoe impressions near Dominguez's body matched Crowell-Ford's shoes. They argued that the eyewitness identification, combined with the physical and circumstantial evidence, proved Crowell-Ford's guilt beyond a reasonable doubt.

The defense characterized the prosecution's argument as mainly focusing on "the gun and its location," and argued that other people aside from Crowell-Ford had access to the gun. The defense further argued that P.I. and A.P. were not credible witnesses because the distance between the shooting and their vantagepoint was too far away to be accurate. They focused on the forensic evidence, noting that Crowell-Ford's fingerprints and DNA were not found on the gun, magazine, or the vent within which the gun was found. Considering the lack of fingerprint and DNA evidence, the

defense argued that ample reasonable doubt existed and asked the jury to find Crowell-Ford not guilty.

*The Verdict and Sentence*

The jury convicted Crowell-Ford of first degree murder and made true findings on the firearms allegations, including allegations that he personally used a firearm, intentionally discharged a firearm, and intentionally discharged a firearm causing great bodily injury or death. (§§ 187, subd. (a); 12022.53, subds. (b)-(d).) The trial court sentenced him to an indeterminate life term of 50 years-to-life in state prison.

DISCUSSION

CALCRIM No. 315, as provided by the trial court, provided 13 factors for the jury to consider when evaluating eyewitness identification testimony, including the certainty of the witness when they made their identification. Our high court in *Lemcke,* expressed concern that the certainty instruction reinforced a common misconception that an "identification is more likely to be reliable when the witness has expressed certainty." (*Lemcke, supra,* 11 Cal.5th at p. 647.) Consequently, the *Lemcke* court held that a "reevaluation of the certainty instruction [in CALCRIM No. 315] is warranted," citing to the "near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.' " (*Ibid*.) The court referred the matter to the Judicial Council and its Advisory Committee on Criminal Jury Instructions to determine whether and how to modify the instruction in a manner that avoided reinforcing "juror confusion regarding the correlation between certainty and accuracy." (*Ibid*.) Until such an evaluation, the court directed the trial courts to "omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id*. at p. 648.)

After *Lemcke* was published, the jury in Crowell-Ford's trial was erroneously instructed to consider the unmodified certainty factor. Crowell-Ford contends the certainty factor instruction violated his constitutional rights and that he was prejudiced as a result.[3] We review Crowell-Ford's challenge to CALCRIM No. 315 de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218 ["The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law"].) In so doing, we "consider the jury instructions as a whole to determine whether error has been committed. [Citations.] We may not judge a single jury instruction in

---

[3] The parties additionally raise the issue of forfeiture. Crowell-Ford concedes that he did not object to CALCRIM No. 315 at trial, but he contends he did not forfeit his claim because no objection is needed when an issue affects his substantial rights.

In *People v. Sanchez* (2016) 63 Cal.4th 411, 461-462 *(Sanchez),* our high court concluded that the defendant forfeited his argument relating to the constitutionality of the certainty factor by failing to object at trial. Although we agree with the Attorney General that Crowell-Ford similarly forfeited his argument, we may only determine whether his "substantial rights" were affected by deciding if the instructions were given in error, and, if so, whether the error was prejudicial. (*People v. Franco* (2009) 180 Cal.App.4th 713, 720 ["Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error."].) Accordingly, in addressing whether his substantial rights were affected, we must necessarily determine the merits of Crowell-Ford's claim that his constitutional rights were violated by the jury instruction and that he suffered prejudice as a result. We therefore discuss the merits of his claim despite our concern that he forfeited the issue by failing to object at trial. Because we reach the merits of the issue and conclude *post* that Crowell-Ford suffered no prejudice from the purported instructional error, we need not address his claim of ineffective assistance of counsel. (See *People v. Anderson* (2001) 25 Cal.4th 543, 569 [to succeed on a claim of ineffective assistance of counsel, the defendant must show that his "counsel's performance fell below a standard of reasonable competence, and that prejudice resulted."].)

11

artificial isolation but must view it in the context of the charge and the entire trial record." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331.)

In support of his argument that the certainty factor instruction was error of a constitutional magnitude, Crowell-Ford discusses the scientific consensus concluding an eyewitnesses' certainty in an identification is not a good predictor of accuracy. He cites to numerous studies that conclude an eyewitnesses' certainty or confidence in an identification is not a good predictor of accuracy and points to other jurisdictions that have rejected jury instructions with similar language to CALCRIM No. 315. We do not disagree with these findings, and we share the *Lemcke* court's concern about the questionable correlation between witness certainty and accuracy.

However, the court in *Lemcke* did not hold that the certainty instruction rendered a defendant's trial fundamentally unfair or otherwise deprived a defendant of due process. (*Lemcke, supra*, 11 Cal.5th at p. 661.) Rather, the court noted that nothing in the instruction operated to " 'lower the prosecution's burden of proof' " or "direct the jury that 'certainty equals accuracy.' " (*Id*. at p. 657.) The certainty factor was simply one of several other factors for evaluating the credibility of witness identification. (*Ibid*.) The jury instruction left for the jury to determine "whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Ibid*.)

Similarly, here, the certainty factor did not function to lessen the prosecution's burden of proof. CALCRIM No. 315 instructed that the "People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime." The certainty instruction was but one factor for the jury to consider; the jury was directed to consider twelve other

12

factors within CALCRIM No. 315, including whether the witness ever failed to identify the defendant. Notably, the main eyewitness did fail to identify Crowell-Ford during his trial. Other instructions also required the jury to focus on various aspects of the eyewitnesses' testimony, including "how well could the witness see, hear, or otherwise perceive the things about which the witness testified."

However, Crowell-Ford further contends that the instructional error was compounded by the prosecution's focus on the certainty factor during closing argument. He argues that the prosecution repeatedly emphasized P.I.'s assertions that he was certain of the accuracy of his identification. By contrast, Crowell-Ford states that his counsel altogether failed to address "how to consider witness certainty," particularly considering that the defense did not present expert testimony relating to eyewitness identification. Consequently, he argues that the jury was "effectively told that it can consider witness certainty as a reflection of witness accuracy."

To be sure, the prosecution did focus on P.I.'s expressions of certainty during closing argument. The prosecution expressly stated P.I. was "certain that the person that he picked out in that infield lineup was the person that was in the field that he saw going toward Mr. Dominguez, hopping over the retaining wall, and going into [the D.C. residence]. He was certain." However, the prosecution did not *equate* P.I.'s expression of certainty with an accurate identification. Rather, the prosecution argued that the strength of the eyewitness identification was supported by other evidence, including P.I. *and* A.P.'s independent descriptions of the perpetrator—which matched Crowell-Ford—along with other physical and circumstantial evidence.

Further, the trial record reflects that the defense was permitted to, and did, present evidence and argument that P.I.'s certainty in his identification

was not correlative of accuracy. On cross-examination, the defense called into question P.I.'s ability to see the events that transpired in the field beyond the mobile home community. The defense elicited testimony from P.I. that he was focused on his work when he heard the gunshots, and that when P.I. observed the perpetrator jump over the retaining wall, he "didn't really observe because [he] didn't think anything was serious." The defense moved to dismiss the case based on a "lack of I.D." and argued to the jury that they should not rely on P.I.'s identification because of the considerable distance between his vantagepoint and where the shooting occurred.

Although Crowell-Ford's case is distinct from *Lemcke* because he did not present an eyewitness identification expert to address the certainty factor, there is no evidence in the record that Crowell-Ford was prohibited from presenting expert testimony, nor does he argue that his counsel was ineffective for opting not to do so. (See *Lemcke, supra,* 11 Cal.5th at p. 658 [the defendant "was *permitted to* present expert witness testimony to combat [the inference that certainty is correlative of accuracy]," (italics added)].) Considering the totality of the trial record, including the defense's cross-examination and argument calling into question the accuracy of the eyewitnesses' identification, we conclude the absence of expert testimony did not exacerbate any inferences suggested by the certainty factor in a manner that violated Crowell-Ford's due process rights. (See *People v. Wright* (2021) 12 Cal.5th 419, 453 [concluding that the defendant's due process rights were not violated by the certainty factor instruction, even in the absence of an eyewitness identification expert].) Rather, the jury instructions contained a multitude of factors for the jury to consider when evaluating the eyewitnesses' testimony, and they did not function to lower the prosecution's burden of proof or direct the jury that certainty equals accuracy.

But even assuming arguendo that the inclusion of the certainty instruction was constitutionally erroneous, reversal is not warranted unless the error was prejudicial.  (See *People v. Hendrix* (2022) 13 Cal.5th 933, 941 ["not every error at trial requires reversal; the law requires us to affirm a jury verdict despite instructional error if the error was harmless"].)  Crowell-Ford urges us to apply the federal *Chapman* (*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*)) standard of review to his claim of instructional error, but he maintains that he was prejudiced under either the *Chapman* standard, or the *Watson* (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)) standard, which applies to questions of state-law error.  The *Chapman* standard " ' "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)  Under *Watson*, we ask whether it is reasonably probable that the defendant would have obtained a more favorable result had the complained-of-error not occurred.  (*Watson*, at p. 836.)

Our Supreme Court has repeatedly applied the *Watson* standard to claims of instructional errors involving the certainty factor.  (See *Sanchez*, *supra*, 63 Cal.4th at p. 463 [applying the standard articulated in *Watson* to determine whether the trial court erred in instructing the jury that it could consider the certainty factor]; *People v.Wright (1988)* 45 Cal.3d 1126, 1144 [analyzing instructional error related to the certainty factor under the *Watson* harmless error standard] (*Wright*).)  Accordingly, the *Watson* standard of review is decidedly applicable to Crowell-Ford's claim of instructional error.  But as we explain, we conclude that prejudice has not been established under either the *Chapman* or *Watson* standard.

During Crowell-Ford's jury trial, ample evidence was presented that he was the perpetrator of Dominguez's murder aside from the eyewitness identification. Two independent witnesses, P.I. and A.P., provided largely matching descriptions of the perpetrator before P.I. identified Crowell-Ford during the infield show-up. They both described the person who fled the field after Dominguez's shooting as a "Black man" wearing a black shirt and black beanie, and P.I. told police the man had "dreadlocks." Police observed Crowell-Ford's appearance upon his arrest to be largely consistent with the witnesses' descriptions. Although Crowell-Ford was wearing a blue shirt when he was apprehended by police, D.C. testified that he had changed out of a black shirt that he was wearing prior to his arrest.

The physical and circumstantial evidence presented during the trial provided further evidence that Crowell-Ford was the perpetrator of the murder. The firearm used in the commission of Dominguez's murder was discovered hidden in a room used by Crowell-Ford's girlfriend. Crowell-Ford had unobserved access to the room where the gun was found, and D.C.'s uncle testified that neither he, nor D.C.'s grandparents, stored a firearm in the home. Crowell-Ford admitted to D.C. that he had been in the area where Dominguez's body was discovered, and P.I. observed a man matching Crowell-Ford's description jump the retaining wall and enter D.C.'s grandparents' home following the shooting. The soles of Crowell-Ford's shoes matched the shoe impressions found next to Dominguez's body and near the retaining wall where the shooting occurred.

Accordingly, given the consistency among the eyewitnesses' descriptions, and the physical and circumstantial evidence pointing to Crowell-Ford as the perpetrator of the murder, we conclude there is no reasonable probability Crowell-Ford would have obtained a more favorable

16

result had CALCRIM No. 315 been modified to omit the certainty factor.  (See *Sanchez*, *supra*, 63 Cal.4th at p. 463; *Wright*, *supra*, 45 Cal.3d at pp. 1144–1145.)  For the same reasons, we further conclude there is no reasonable doubt the jury would have returned a guilty verdict in the absence of the certainty factor instruction.  (*Chapman*, *supra*, 386 U.S. at p. 24.)  Thus, any instructional error was harmless beyond a reasonable doubt.

DISPOSITION

The judgment is affirmed.

CASTILLO, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.